**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 2, 2006**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 04-11337

FANTASY RANCH INC. doing business as Fantasy Ranch

Plaintiff-Appellant,

COWTOWN EXPOSITION, INC. doing business as X.T.C. Tan;
TAZZ MAN INC. doing business as Hardbody's of Arlington,
Texas, doing business as Peep-Tom's; HARRY FREEMAN,
doing business as Flash Dancer

Intervenor-Plaintiffs-Appellants,

versus

CITY OF ARLINGTON, TEXAS,
THERON BOWMAN, Chief of Police

Defendants-Appellees.

Appeals from the United States District Court
for the Northern District of Texas

Before GARWOOD, BENAVIDES, and OWEN, Circuit Judges.

GARWOOD, Circuit Judge:

Appellants challenge the City of Arlington's recently enacted
Sexually Oriented Business Ordinance as an unconstitutional
restriction of their expressive liberties. We affirm the trial
court's judgment sustaining the ordinance.

1

## FACTS AND PROCEEDINGS BELOW

A. Plaintiff-appellant Fantasy Ranch, Inc. ("Fantasy Ranch"), and intervenor plaintiffs-appellants, Cowtown Exposition, Inc., Tazz Man Inc., and Harry Freeman, are sexually oriented businesses ("SOBs") that feature topless dancing and operate under renewable licenses granted by defendant-appellee the City of Arlington, Texas ("the City"). Defendant-appellee Theron Bowman is the City's Chief of Police; as such, he is charged with enforcing the ordinances that the Arlington SOBs claim violate the Constitution. In October 2002, Bowman, acting pursuant to the City's Sexually Oriented Business Ordinance ("the SOB Ordinance") as it then-existed, notified Fantasy Ranch by letter of his intent to suspend its license to operate as a SOB for three days. According to the letter, Fantasy Ranch's license was subject to a temporary suspension under § 4.05 of the SOB Ordinance, which at that time required suspension of a SOB's license if "the [City's] Chief of Police determine[d] that [a SOB] licensee, operator or an employee . . . ha[d] . . . on five (5) or more occasions within any one (1) year period of time, violated [the City's prohibition on touching between topless dancers and patrons] and ha[d] been convicted or placed on deferred adjudication or probation for the violations." Although Fantasy Ranch requested and received a hearing on the proposed suspension, its objections failed, and in December 2002 the Deputy Chief of Police (before whom the hearing was conducted)

2

ordered that the three-day license suspension go forward beginning January 26, 2003.  Before the suspension took effect, Fantasy Ranch filed this  lawsuit in the Northern District of Texas.

B.    The City's Sexually Oriented Business Ordinance

Like many cities, Arlington maintains a series of ordinances that regulate SOBs through a combination of zoning restrictions, licensing requirements, and criminal laws.  The appellants' claims focus on two groups of provisions in the City's current SOB Ordinance: (1) the "Proximity Provisions," which consist of (a) a buffer zone and stage height provision, (b) a floor demarcation provision, and (c) a tipping provision; and (2) the "Licensing Provisions," which define the procedure and substance governing suspension and revocation of a SOB's business license.

1.    The Proximity Provisions

First among the Proximity Provisions are buffer zone and stage height requirements, which prohibit a "licensee, operator or employee" of a SOB from:

> "knowingly allow[ing], in a Sexually Oriented Business another to appear in a state of nudity, unless the person is an employee [of the SOB] who, while in a state of nudity, is on a stage (on which no customer is present) at least eighteen (18) inches above the floor, and is: (1) at least six (6) feet from any customer . . . ; or (2) physically separated from customers by a solid clear transparent unbreakable glass or plexiglass wall with no openings that would permit physical contact with customers."

Arlington, Tex., Ordinance 03-044, § 6.03(B) (April 15, 2003).

3

Second is the SOB Ordinance's demarcation provision, which mandates that a "licensee, operator or employee [of a SOB] . . . prominently and continuously display a two inches wide glow-in-the-dark line on the floor of the [SOB] marking a distance of six feet from each unenclosed stage on which an employee in a state of nudity may appear." *Id.* § 6.04(B). Third, the SOB Ordinance regulates the tipping of nude dancers by prohibiting customers or patrons from tipping a nude SOB employee "directly" but permitting tipping of a nude SOB employee through either "a tip receptacle, located more than six (6) feet from the nearest point of the performance stage where [the SOB] employee is in a state of nudity, or . . . an employee that is not in a state of nudity, as part of the customer's bill." *Id.* § 6.03(C).

The City contends that the Proximity Provisions are designed to alleviate the negative secondary effects that flow from violations of its no-touch ordinance, which has long prohibited touching between nude SOB employees and SOB customers. According to the City's findings listed in the ordinance enacting the Proximity Provisions, the no-touch provision, standing alone, did not effectively prevent touching between nude SOB employees and their customers. The City explains that the Proximity Provisions were intended to address the no-touch provision's inadequacy by further limiting activities that allow and often result in a close proximity between nude SOB employees and their customers. In

4

support of the Proximity Provisions, the City amassed the following evidentiary record which included: (1) references respecting the Proximity Provisions to (a) judicial decisions addressing similar ordinances from other cities and discussing the adverse secondary effects addressed by those ordinances, and (b) studies conducted in other jurisdictions on the adverse secondary effects of SOBs; (2) reports of numerous no-touch violations at SOBs within the City; (3) testimony regarding the effectiveness of stage height requirements in enforcing a no-touch rule; and (4) a report prepared by the City's expert witness, Dr. Goldsteen, concluding that the Proximity Provisions would effectively prevent touching between nude employees and patrons.

2.   The Licensing Provisions

The Licensing Provisions set out the procedural and substantive scheme governing suspension and revocation of a SOB's license to do business. *See* Arlington, Tex., Sexually Oriented Business Ordinance § 4.01. It is the alleged procedural and substantive invalidity of these provisions that originally prompted this lawsuit. Since initiation of this case, however, the City has amended the Licensing Provisions significantly. Because of these amendments, the district court concluded that all of Fantasy Ranch's challenges to the previous Licensing Provisions are moot. To review the district court's judgment on this point, then, requires an understanding of how the pre-amendment version of the

Licensing Provisions compares with the post-amendment version.

a.   The Pre-amendment Licensing Provisions

Prior to their amendment by the City, and at the time that Fantasy Ranch originally filed this suit, the Licensing Provisions required that a SOB's license be temporarily suspended

> if the [City's] Chief of Police determine[d] that a licensee(s), operator(s), or employee(s) of a licensee ha[d] . . . [o]n five (5) or more occasions within any one (1) year period of time, violated [the no-touch] provisions [of the SOB Ordinance] and ha[d] been convicted or placed on deferred adjudication or probation for the violations."

Arlington, Tex., Sexually Oriented Business Ordinance § 4.05(A)(1), *amended by* Arlington, Tex. Ordinance 03-041, § 4.05(A)(1) (April 1, 2003). Following the fourth such temporary suspension, the pre-amendment Licensing Provisions required that the City revoke the SOB's license. *Id.* § 4.06(A)(1). Once a SOB received notice that the Chief of Police had determined that its license was subject to a temporary suspension for five no-touch violations, the pre-amendment Licensing Provisions granted the SOB the right to challenge that notice of suspension either in writing to the City's "Chief of Police" or by requesting a hearing before the "Chief of Police" — a term that the Licensing Provisions defined to include, *inter alia*, the "Deputy Chief of Police." *Id.* § 4.07. The pre-amendment Licensing Provisions did not define the procedural or substantive rules and standards according to which the Chief of

6

Police (or his deputy) was to render his decision. If the Chief of Police ordered a temporary suspension of the SOB's license to proceed, the pre-amendment Licensing Provisions permitted that SOB to appeal the suspension to a Texas state court, and the suspension would not go into effect until after the conclusion of that appeal. *Id.* §§ 4.05(A), 4.09.

b.   The Post-amendment Licensing Provisions

On April 1, 2003, after Fantasy Ranch filed this lawsuit to challenge the constitutionality of the SOB Ordinance's pre-amendment Licensing Provisions, the City enacted Ordinance No. 03-041, which significantly amended the Licensing Provisions to incorporate more substantive and procedural protections for SOBs. Specifically, under the post-amendment Licensing Provisions, the Chief of Police could suspend a SOB's license because of that SOB's employees having been convicted of five violations within any one year of the no-touch or Proximity Provisions *only* if the SOB had been given notice of the citations for those violations within three business days following the issuance of the citation. Arlington, Tex., Ordinance 03-041, § 4.05(A)(1). In addition, the amended Licensing Provisions created an affirmative defense for SOBs faced with such a possible license suspension:  "It shall be an affirmative offense [sic] to [a] suspension [arising out of five violations of the no-touch or Proximity provisions] if [the SOB] shows by a preponderance of the evidence that it was powerless to

7

prevent [the no-touch or Proximity] violation[s]." *Id.* § 4.05(B). Moreover, the post-amendment Licensing Provisions more clearly delineate the procedural and substantive rules governing the Chief of Police's resolution of a SOB's challenge to a notice of suspension. Specifically, the amended Licensing Provisions (1) provide for an evidentiary hearing before an administrative law judge (rather than before the Chief of Police or his deputy) and grant that judge the responsibility of ruling on procedural and evidentiary questions that arise during the hearing; and (2) define what evidence the Chief of Police may consider when deciding whether to suspend the SOB's license. *Id.* §§ 4.07. Finally, certain aspects of the Licensing Provisions were unaffected by Ordinance No. 03-041. Namely, the post-amendment Licensing Provisions continue to permit an aggrieved SOB to appeal its license suspension to state court, and the provisions still provide that the license suspension is stayed pending the outcome of that appeal. *Id.* § 4.09. In addition, under the post-amendment Licensing Provisions, four temporary license suspensions still result in revocation of a SOB's license on the fifth violation. *Id.* § 4.06(A)(1).

C. Procedural History

In January 2003, after Fantasy Ranch's administrative challenge to the City's proposed suspension of its license failed, but before the three-day suspension ordered by Chief Bowman was to

8

go into effect, Fantasy Ranch filed suit in the Northern District of Texas seeking declaratory judgment that the license suspension and revocation scheme created by the pre-amendment Licensing Provisions (1) violated the First Amendment by (a) operating as a prior restraint, and (b) failing to satisfy the requirements for content-neutral speech-inhibiting regulations set forth in *United States v. O'Brien*, 88 S.Ct. 1673 (1968); and (2) violated the procedural component of the Due Process Clause. Two months later, in March 2003, Fantasy Ranch moved for summary judgment on all of these claims.

On April 1, 2003, before the City responded to Fantasy Ranch's motion for summary judgment, the City enacted the first of four amendments to the SOB Ordinance that directly impact this case. The City first enacted Ordinance No. 03-041, which, as explained *supra*, amended the Licensing Provisions by enhancing the procedural and substantive protections afforded to SOBs during the license suspension and revocation process. Based on these enhanced protections, the City filed its first amended answer to Fantasy Ranch's original complaint, asserting that Ordinance No. 03-041's changes to the Licensing Provisions rendered all of Fantasy Ranch's claims challenging the pre-amendment Licensing Provisions moot. In addition, the City's first amended answer asserted that it would not ever enforce the temporary suspension of Fantasy Ranch's license that it had ordered under the pre-amendment Licensing

9

Provisions.[1]

On April 15, 2003, just two weeks after enacting Ordinance No. 03-041, the City again amended its SOB Ordinance by enacting Ordinance No. 03-044. That amendment established the above described Proximity Provisions of which the Arlington SOBs now complain. Prior to the enactment of the ordinance, the City's SOB Ordinance only (1) prohibited touching between nude dancers and their customers, and (2) required that signs be placed at the entrances to SOBs informing customers of the no-touch rule. Arlington, Tex., Ordinance 03-044, §§ 6.03(B)-(C), 6.04(B). As discussed *supra*, the City found the additional Proximity Provisions to be necessary because the existing no-touch and signage rules did not effectively prevent touching between nude dancers and patrons. Specifically, the City, in enacting these additional provisions, expressly found that SOBs "have not complied with the 'no touch' provisions, [and] have flagrantly disregarded them and/or encouraged employees and customers to violate the 'no touch' provision." *Id.* § 1.03 ¶ 29. Moreover, according to these formal findings of the City, "[c]ompelling signage at the entrances of [SOBs] has not been effective in halting 'no touch' violations."

---

[1]During oral argument before this court, the City repeated this promise, and also expressly agreed that it would not only not try to enforce this suspension but also that it would not ever try to use it as one of the four predicate temporary suspensions necessary under the ordinance to permanently suspend an SOB's license.

10

*Id.* § 1.03 ¶ 31.

On May 1, 2003, in response to the amendment of the Licensing Provisions and the addition of the Proximity Provisions, Fantasy Ranch filed an amended complaint in which it (1) disputed the City's assertion that all of its claims attacking the pre-amendment Licensing Provisions were moot, and (2) asserted new claims challenging the post-amendment Licensing Provisions, arguing essentially that those provisions suffer from the same constitutional infirmities as the pre-amendment Licensing Provisions. The next month, on June 23, 2003, Fantasy Ranch filed a supplemental complaint in which it again asserted new claims, this time challenging the Proximity Provisions, arguing that those provisions violate the First Amendment.

With the enactment of the Proximity Provisions, other SOBs became interested in the litigation and, on June 27, 2003, the district court granted intervenor Plaintiffs-Appellants Tazz Man, Inc., Cowtown Exposition, Inc., and Harry Freeman leave to intervene. The intervenor SOBs limited their challenges to the constitutionality of the Proximity Provisions and, therefore, are not parties to Fantasy Ranch's due process and related First Amendment challenges to the Licensing Provisions.

When the dust settled, the district court had before it constitutional claims challenging the pre- and post-amendment

11

Licensing Provisions and the Proximity Provisions.[2]  Fantasy Ranch alone challenged the pre-amendment Licensing Provisions, arguing (1) that those provisions (a) effected a prior restraint in violation of the First Amendment, and (b) prior to Fantasy Ranch's license being temporarily suspended, failed to provide Fantasy Ranch with the process it was constitutionally due; and (2) that its claims were not mooted by either the City's amendment of the Licensing Provisions or the City's pledge not to enforce its temporary suspension of Fantasy Ranch's license.  Also alone, Fantasy Ranch challenged the post-amendment Licensing Provisions, essentially arguing that those provisions failed for the same reasons as the pre-amendment Licensing Provisions.  Finally, all of the Arlington SOBs challenged the Proximity Provisions, arguing that those provisions are unconstitutional restrictions on symbolic speech.

In February 2004, the Arlington SOBs moved for summary judgment on all of their claims, and in March 2004 the City cross-moved for summary judgment.  Five months later, in August 2004, the district court issued a memorandum opinion and order granting summary judgment to the City, denying the Arlington SOBs' motion for summary judgment, and holding the Proximity Provisions constitutional.  The district court's August 2004 opinion did not, however, address Fantasy Ranch's constitutional claims directed at

_____

[2]Other claims by the Arlington SOBs were also before the district court, but those claims are not relevant to this appeal.

12

the pre- and post-amendment versions of the Licensing Provisions; rather, the district court waited until its final judgment, which was issued in September 2004, to resolve those claims. In that judgment, the court held (without further elaboration) that "[i]n regards to . . . Fantasy Ranch's causes of action attacking the Constitutionality of § 4.05 and § 4.07 [the Licensing Provisions], as set forth in its pleadings . . . , the claims are moot and . . . the statutory provisions at issue are Constitutional."

**DISCUSSION**

I.   The Proximity Provisions

We first address the appellants' First Amendment challenge to the ordinance's Proximity Provisions, and hold that those provisions satisfy the four-part test set forth in *O'Brien* for content-neutral restrictions on symbolic speech.

We review the district court's grant of summary judgment *de novo,* applying the same legal standard as the district court. *Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001). "Summary judgment is appropriate only if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' when viewed in the light most favorable to the non-movant, 'show that there is no genuine issue as to any material fact.'" *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Anderson v. Liberty Lobby Inc.*, 106 S.Ct. 2505 (1986)).

13

"While it is now beyond question that nonobscene nude dancing is protected by the First Amendment, even if 'only marginally so,' it is also clear that the government can regulate such activity." *LLEH, Inc. v. Wichita County, Texas*, 289 F.3d 358, 365 (5th Cir. 2002) (citations omitted). Indeed, nude dancing falls only "within the outer ambit of the First Amendment's protection." *City of Erie v. Pap's A.M.*, 120 S.Ct. 1382, 1391 (2000) (plurality opinion); *see also Barnes v. Glen Theatre*, *Inc.*, 111 S.Ct. 2456 (1991) (plurality opinion).

A.   Strict or Intermediate Scrutiny

We must first determine, then, what level of scrutiny applies, a question that depends on whether the government's predominate purpose in enacting the regulation is related to the suppression of expression itself. *Pap's A.M.*, 120 S.Ct. at 1391 (plurality opinion). If the government's interest is indeed related to the suppression of content, then that regulation of symbolic speech is subject to strict scrutiny. *See Texas v. Johnson*, 109 S.Ct. 2533 (1989). If, however, the government's predominate purpose is unrelated to the suppression of expression, such that the regulation can be "justified without reference to the content of the regulated speech," then intermediate scrutiny applies. *Clark v. Community for Creative Non-Violence*, 104 S.Ct. 3065, 3069 (1984); *see also O'Brien*.

The City of Arlington contends that its ordinance is "content

14

neutral," arguing that it targets only negative secondary effects of speech, not content. The appellants counter that the ordinance is "content based," arguing that the ordinance's predominate interest is, in fact, the suppression of their erotic message, a message which, they further contend, has never been shown by the City to produce any negative secondary effects.

Courts routinely apply *intermediate* scrutiny to government regulation of sexually oriented businesses, and we again do so today. *See Pap's A.M.*, 120 S.Ct at 1391 ("government restrictions on public nudity . . . should be evaluated under the framework set forth in *O'Brien* for content-neutral restrictions on symbolic speech."); *see also N.W. Enterprises Inc. v. City of Houston*, 352 F.3d 162, 173 (5th Cir. 2003); *LLEH v. Wichita County, Tex.*, 289 F.3d 358, 364 (5th Cir.2002); *Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288, 291 (5th Cir. 2003). In *LLEH v. Wichita County*, for example, this court applied *O'Brien*'s intermediate scrutiny to a public lewdness ordinance that was nearly identical to the one at issue here, reversing the district court's bench-trial judgment in favor of a sexually oriented business, and holding that a six-foot buffer requirement, an 18-inch stage height requirement, and a demarcation requirement were all constitutional under *O'Brien*.[3] And, in *Pap's A.M.*, a divided Supreme Court upheld

---

[3] We acknowledge that in *LLEH* none of the parties challenged on appeal the *O'Brien* intermediate scrutiny standard applied by

15

an ordinance that banned all public nudity and, as a consequence, required the City's erstwhile nude dancers to wear pasties and g-strings during their performances.  120 S.Ct. 1383 (2000).  In deciding to apply *O'Brien*'s intermediate scrutiny, the Court reasoned that the ordinance was "on its face a general prohibition on public nudity," and noted that the City of Erie's "asserted interest in combating the negative secondary effects associated with adult entertainment establishments . . . is unrelated to the suppression of the erotic message conveyed by nude dancing." *Id.* at 1391-92, 1394.

We acknowledge that in *Pap's A.M.* the Court was persuaded of the ordinance's content neutrality by two related considerations, only one of which is present here.  First, the Court noted that "the ordinance . . . is aimed at combating crime and other negative secondary effects caused by the presence of adult entertainment establishments . . . and not at suppressing the erotic message conveyed by this type of nude dancing," a consideration which is also present here, since, as we discuss below, the City of Arlington's ordinance is also aimed predominately at secondary effects.  The second consideration relied upon in *Pap's A.M.*, however, was that the City of Erie's ordinance banned "all public nudity," and that the ordinance was therefore *content neutral* because it was *facially neutral*. *Pap's A.M.*, 120 S.Ct. at 1391

_____

the district court.  *Id*., 289 F.3d at 366.

16

("The ordinance here . . . is on its face a general prohibition on public nudity. . . . It does not target nudity that contains an erotic message."); *see also Barnes v. Glen Theatre, Inc.*, 111 S.Ct. 2456, 2461 (1991) ("Indiana's public indecency statute . . . predates barroom nude dancing and was enacted as a general prohibition."). By this second consideration, facial neutrality, the City of Arlington's ordinance is not content neutral, because it targets only sexually oriented businesses.

We understand, of course, that the City of Arlington's targeted ordinance "might simply reflect the fact that [Arlington] had recently been having a public nudity problem not with streakers, sunbathers or hot dog vendors . . . but with lap dancers." *Pap's A.M.*, 120 S.Ct. at 1401 (Scalia, J. concurring). Indeed, it would seem mere pretext if the City of Arlington, in the name of facial neutrality, also required nude-ballet buffer zones, thereby invoking and eradicating a non-existent public nuisance.

We therefore hold that an ordinance such as the one before us is content neutral so as long as the ordinances's predominate concern is for secondary effects, a holding supported by our sister circuits and a careful reading of a fractured Court.[4] The Sixth

---

[4]In *City of Los Angeles v. Alameda Books*, 122 S.Ct. 1728 (2002), at least five Justices acknowledged that SOB zoning ordinances were actually content based, yet nevertheless applied intermediate scrutiny, explaining, in Justice Kennedy's concurrence, that "the ordinance is not so suspect that we must employ the usual rigorous analysis that content-based laws demand in other instances." The reasons given for the ordinance there

and Ninth Circuits, for example, while upholding buffer-zone and stage-height requirements similar to the one here, have classified such provisions as content neutral. In *Deja Vu, Inc. v. Nashville*, the Sixth Circuit held that a three-foot buffer zone and an eighteen-inch stage-height requirement were subject to intermediate scrutiny, explaining that "[w]e have previously recognized that ordinances aimed at regulating adult entertainment businesses constitute content-based regulations, but that 'a distinction may be drawn between adult [businesses] and other kinds of [businesses] without violating the government's paramount obligation of neutrality' when the government seeks to regulate only the secondary effects of erotic speech, and not the speech itself."). 274 F.3d 377, 391 (6th Cir. 2001) (citations omitted). Likewise, in *Kev, Inc. v. Kitsap County*, the Ninth Circuit held that (1) a ten-foot buffer zone, (2) a two-foot stage-height requirement, and (3) a no tipping rule were all subject to intermediate scrutiny, explaining that "[t]he stated purpose of the County's ordinance is to alleviate undesirable social problems that accompany erotic dance studios, not to curtail the protected expression—namely, the dancing. . . . Thus, we conclude that the ordinance is content-

being "not so suspect," however, may be unique to zoning regulations. *See Alameda Books*, 122 S.Ct. at 1740–41 (explaining that zoning regulations merit a presumption of validity since they have historically targeted secondary effects, not content). *Cf. G.M. Enterprises, Inc. v. Town of St. Joseph*, 350 F.3d 631, 637 (7th Cir. 2003) (suggesting that intermediate scrutiny might apply to similar  content-based restrictions on symbolic speech).

18

neutral because it is justified without 'reference to the content of the regulated speech.'"  793 F.2d 1053, 1059 (9th Cir. 1986).

Indeed, *Pap's A.M* itself provides support for this approach. For although the court there emphasized that "Erie's ordinance is *on its face* a content-neutral restriction on conduct," the plurality also remarked, "Even if the City thought that nude dancing . . . constituted a particularly problematic instance of public nudity, the regulation is still properly evaluated as a content-neutral restriction because the interest in combating the secondary effects associated with those clubs is unrelated to the suppression of the erotic message conveyed by nude dancing." *Pap's A.M.*, 120 S.Ct at 1394. (emphasis added).  And, in a separate concurrence, Justice Scalia , joined by Justice Thomas, made a similar point, noting that "even were I to conclude that the City of Erie had specifically singled out the activity of nude dancing, I still would not find that this regulation violated the First Amendment unless I could be persuaded . . . that is was the communicative character of nude dancing that prompted the ban." *Pap's A.M.*, 120 S.Ct at 1402 (Scalia, J. concurring).  Finally, while discussing the secondary effects doctrine in the context of zoning ordinances, Justice Kennedy has explained, "The ordinance may identify the speech based on content, but only as a shorthand for identifying the secondary effects . . . ." *City of Los Angeles v. Alameda Books, Inc.*, 122 S.Ct 1728, 1742 (2002).  *See also*

19

*R.A.V. v. City of St. Paul*, 112 S.Ct. 2538, 2546 (1992) (noting that a "valid basis for according differential treatment to even a content-defined subclass of proscribable speech is that the subclass happens to be associated with . . . 'secondary effects' of the speech, so that the regulation is '*justified* without reference to the content of the . . . speech.'").

Applying this result to our case, we agree with the district court's ruling that because the City of Arlington's SOB ordinance is predominately targeted to the prevention of secondary effects, not to the suppression of symbolic expression, it is entitled to intermediate scrutiny. The purpose of Ordinance No. 03-044, even as the appellant sees it,[5] is to better enforce the City's previously enacted "no touch" rule, a rule that itself targeted the very same secondary effects that continue to trouble the City today — prostitution, assault, drug dealing, and even the touching itself. The content of the erotic speech affected by this ordinance (that message which is allegedly conveyed by dancing nude within six feet of a person) is, according to the appellant's expert, a message of "comfort/support, friendliness, trust, inclusion, immediacy, humanity, play, affection, sensuality, desirability, [and] love." It is easy to imagine a regulation that

_____

[5]The appellants argue in their brief to this court that "[t]he predominate concern of Ordinance No. 03-044 was, and remains today, the conduct-generated adverse effects of touching."

might directly target such a message, especially when it is communicated between strangers for a fee; however, this particular ordinance's stated purpose is to eradicate certain negative secondary effects that flow from this particular form of symbolic speech,[6] particularly the physical contact between dancer and patron that we have already held to be unprotected by the First Amendment, *see Hang On, Inc. v. City of Arlington*, 65 F.3d 1248 (5th Cir. 1995), and the crimes which that touching encourages and facilitates. As the *Pap's A.M.* plurality explained, "If States are to be able to regulate secondary effects, then *de minimis* intrusions on expression such as those at issue here cannot be sufficient to render the ordinance content based." *Pap's A.M*, 120 S.Ct. at 1394. Here, the ordinance attempts to control secondary effects while leaving the "quantity and accessibility of speech substantially intact." *Alameda Books*, 122 S.Ct at 1742.[7]

---

[6]*See* Arlington, Tex., Ordinance 03-044, § 1.02 ("**Purpose and Intent** It is the purpose of this Chapter to regulate Sexually Oriented Businesses to promote the health, safety, morals and general welfare of the citizens of the City . . . . The provisions of this Chapter have neither the purpose nor effect of imposing a limitation or restriction on the content of any communicative materials . . . ."); *see also id.* § 1.03 ("**Findings** Based on evidence concerning the adverse secondary effects of Sexually Oriented Businesses on the community . . . .").

[7]As proof of the City's content-based motives, appellants draw our attention to the ordinance as originally enacted, which included a provision allowing City officials to ban particular dance movements. We disagree that such a provision suffices as to proof of illicit motive of the later enacted ordinance. The provision in question was ultimately rejected. Moreover, the provision might have been understood as an attempt to enforce the

21

The appellants urge, however, that because the alleged secondary effects result only from actual physical contact, not from mere proximity, the City could not realistically hope to eradicate them by going, literally, above and beyond the "no-touch" rule and enacting buffer zone and stage-height requirements.

The appellants' argument is flawed. This stage of the analysis—whether there is content neutrality—is simply the wrong place to dispute either the *existence* of the secondary effects or the *efficacy* of the challenged ordinance. Presently, we are concerned only with the ordinance's stated purpose; if the government's interest is unrelated to expression, then intermediate scrutiny applies. *See Pap's A.M.*, 120 S.Ct at 1396 ("*O'Brien*, of course, required no evidentiary showing at all that the threatened

---

"no-touch" rule through the elimination of dance movements that might result in incidental contact between dancer and patron. More importantly, "this [c]ourt will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive." *Pap's A.M.*, 120 S.Ct at 1392; *see also Barnes*, 111 S.Ct. at 2469 ("At least as to the regulation of expressive conduct, 'we decline to void [a statute] essentially on the ground that it is unwise legislation which [the legislature] had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a "wiser" speech about it.'"(Souter, J., concurring) (quoting *O'Brien*, 88 S.Ct. at 1683). For example, the *O'Brien* court ignored the following legislative history which, if credited, may have called into question the relevant statute's content neutrality: "The [Senate] committee has taken notice of the defiant destruction and mutilation of draft cards by dissident persons who disapprove of national policy. If allowed to continue unchecked this contumacious conduct represents a potential threat to the exercise of the power to raise and support armies." *O'Brien*, 88 S.Ct. 1637, 1684 (1968) (appendix).

22

harm was real."). Application of *O'Brien*'s intermediate scrutiny, however, gives those challenging the ordinance an opportunity to convince the court that the ordinance does not actually further any substantial government interests, or, relatedly, that no substantial government interests exist. *See N.W. Enterprises*, 352 F.3d at 176 ("[T]he constitutional standard of review depends only upon the City's predominate legislative concern, not its pre-enactment proof that the ordinance would work . . . .").

B.   Applying *O'Brien*

Because we conclude that Ordinance No. 03-044 is content neutral, it is a constitutional restriction on symbolic speech if it satisfies the four factor test from *O'Brien*. Applying the *O'Brien* standard here, we conclude that the City of Arlington's ordinance passes the test. A public nudity ordinance that incidentally impacts protected expression should be upheld if (1) it is within the constitutional power of the government; (2) it furthers an important or substantial government interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on first amendment freedoms is no greater than is essential to the furtherance of that interest.

The first prong of *O'Brien*, which is unchallenged by appellants, is whether the ordinance is within the constitutional power of the Arlington City Council. Even if challenged, this

23

prong would easily be satisfied, since ordinances aimed at protecting the health and safety of citizens are squarely within the City's police powers. *Pap's A.M.*, 120 S.Ct. at 1395. The second prong of *O'Brien* is whether the regulation furthers an important or substantial government interest. The Court has identified two distinct questions packaged within this second prong. *See Pap's A.M.*, 120 S.Ct. 1397 (describing the two questions as, first, "whether there is a substantial government interest . . . *i.e.* whether the threatened harm is real," and, second, "whether the regulation furthers that interest"). The appellants challenge the ordinance on both grounds, arguing first that a question of material fact exists as to whether "prostitution transactions, narcotics transactions, and assault result from proximity between dancer and patron during performances," and second that, even if these do exist, a question of material fact exists as to whether Ordinance No. 03-044 will ameliorate the problem.

Both of these challenges raise questions of evidence that we evaluate using the standard described in *City of Renton v. Playtime Theatres, Inc.*, 106 S.Ct. 925 (1986), as modified by *Alameda Books*. *See Pap's A.M.*, 120 S.Ct. at 1395 ("[T]he evidentiary standard described in *Renton* controls here . . . ."); *Alameda Books, Inc.*, 122 S.Ct. 1728, 1733 ("We granted certiorari to clarify the standard for determining whether an ordinance serves a substantial government interest under *Renton*.") (citations omitted). The

*Renton* evidentiary standard, as reaffirmed in *Alameda Books*, provides that "a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest." *Alameda Books*, 122 S.Ct. at 1736 (quoting *Renton*, 106 S.Ct. at 931); *see also N.W. Enterprises Inc. v. City of Houston*, 352 F.3d 162, 180 (5th Cir. 2003). Justice Kennedy's concurrence noted that "[t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities . . . ." *Alameda Books*, 122 S.Ct. at 1743 (quoting *Renton*, 106 S.Ct. at 931).[8] However, the plurality cautioned that the government cannot rely on "shoddy data or reasoning," explaining that:

> the municipality's evidence must fairly support the municipality's rationale . . . . If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standards set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance."

*Alameda Books*, 122 S.Ct. at 1736 (plurality opinion) (citing *Pap's A.M.*, 120 S.Ct. at 1395-96); *see also Alameda Books*, 122 S.Ct. at

---

[8]In *Pap's A.M.*, the Court held that a municipality's own findings and "reasonable belief that the experience of other jurisdictions is relevant to the problem it is addressing" were a sufficient evidentiary basis. 120 S.Ct. at 1395.

1742-44 (Kennedy, J., concurring).

The City of Arlington's summary-judgment evidence fairly supports its rationale by demonstrating a connection between speech and a substantial, independent government interest. The record before use includes a report by the City's expert, Dr. Joel B. Goldsteen; several studies, conducted both within the City of Arlington and in other communities; as well as data cited in numerous courts opinions, all of which demonstrate a connection between dancer-patron touching and unsavory secondary effects. Also in the record are findings that the City's prior "no touch" ordinance had been consistently flouted and that attempts to enforce it had been costly and not adequately effective.

Faced with the "no touch" ordinance's failure to achieve its purpose, the City enacted the current version of the Ordinance, including proximity provisions, demarcation requirements, and a no tipping rule, which the City believes are necessary to insure compliance with the "no touch" rule and to thereby eliminate the secondary effects that it targets. The City supports this belief with a Los Angeles Police Department study of criminal acts that are associated with close proximity between dancer and patron. Indeed, the appellants' own expert, Dr. Hanna, admits the very fact upon which the City's inference rests, noting that "[c]loseness and interaction between a performer and an individual patron permit the dancer to show special interest in the patron . . . . This occurs

26

through eye contact, pupil dilation and . . . *incidental touch* . . . ." (emphasis added).

The appellants respond, however, that the ordinance's *pre-enactment* record contains no empirical support for the City's alleged link between proximity and the targeted secondary effects. They point to their deposition of the City's expert, Dr. Goldsteen, who conceded that, pre-enactment, he was unaware of "any empirical studies which gauge the level of secondary effects which occur inside a gentlemen's club which is correlated to the distance between dancer and patron," and that he had not read "any report . . . of that nature prior to [his] report to the city council . . . ."  Further, appellants note that their own expert, Bruce McLaughlin, concluded that "[n]othing in Goldsteen's report or in the materials which he could have examined establishes a correlation between dancer-patron proximity, let alone a causal relationship between such proximity, and adverse secondary effects."  Echoing the appellant's concern for *pre-enactment* justification, McLaughlin concluded, "The Arlington City Council had before it nothing whatsoever with respect to proximity of dancers and patrons other than Goldsteen's conjecture and speculation."

The appellant's focus on the City Council's pre-enactment rationale is misplaced, since "[o]ur appropriate focus is not an empirical enquiry into the actual intent of the enacting

27

legislature, but rather the existence or not of a *current governmental interest* in the service of which the challenged application of the statute may be constitutional." *LLEH*, 289 F.3d at 368 (emphasis added) (quoting *Barnes v. Glen Theatre*, Inc., 111 S.Ct. 2456, 2469 (1991) (Souter, J., concurring)); *see also N.W. Enterprises*, 352 F.3d at 175 ("[T]he City need not demonstrate that the City Council actually relied upon evidence of negative secondary effects . . . . A local government can justify a challenged ordinance based both on evidence developed prior to the ordinance's enactment and that adduced at trial.").

The appellants further argue, in the alternative, that the *post-enactment* rationale offered by the City is "shoddy," and contend that even if the City has met its burden of demonstrating a rationale for regulating proximity, they've cast sufficient doubt upon that rationale, as described in *Alameda Books*, to shift the burden back to the City to supplement the record and thereby preclude summary judgment. *See, e.g.*, *Peek-A-Boo Lounge v. Manatee County*, 337 F.3d 1251, 1270–71 (11th Cir. 2003) (reversing a summary judgment in favor of the County because the Peek-A-Boo Lounge had "successfully cast doubt on the County's rationale by placing into the record substantial and unanswered factual challenges."). In support of this claim, the appellants point to an affidavit by their expert, Joe Morris, who, after collecting data from open records requests to the Arlington police department

28

and the municipal court, reported that there were no arrests, citations, or police calls for prostitution, solicitation, assault, or narcotics at any of the City of Arlington's adult cabarets from July 1, 2002 through July 1, 2003.

We find this evidence, even when viewed in a light most favorable to the plaintiff, plainly insufficient to preclude summary judgment. Indeed, "[a]lthough this evidence shows that [the City] might have reached a different and equally reasonable conclusion regarding the relationship between adverse secondary effects and sexually oriented businesses, it is not sufficient to vitiate the result reached in the [City's] legislative process." *G.M Enterprises, Inc. v. Town of St. Joseph*, 350 F.3d 631, 639 (7th Cir. 2003) (affirming summary judgment in favor of the Town's five-foot buffer and eighteen-inch stage-height requirement despite meaningful countervailing evidence presented by the plaintiffs). At best, Joe Morris's report suggests that no *arrests* at strip clubs had occurred for prostitution, drugs, or assault, a fact that is likely of little comfort to the City of Arlington, which passed this ordinance at least in part because dancer-patron proximity in a dimly-lit room made such crimes difficult to police. Ultimately, we are not empowered by *Alameda* to second-guess the empirical assessments of a legislative body, nor are we expected to submit such assessments to a jury for re-weighing; instead, the relevant "material fact" that must be placed at issue is whether the

29

ordinance is supported by evidence that can be "*reasonably* believed to be relevant to the problem." *See Renton*, 106 S.Ct. at 931 (emphasis added); *see also N.W. Enterprises*, 352 F.3d at 180; *Alameda Books*, 122 S.Ct. at 1743 (Kennedy, J., concurring) ("[T]he Los Angeles City Council knows the streets of Los Angeles better than we do."). Because no such issue of material fact exists, we hold that Ordinance No. 03-044 satisfies the second prong of *O'Brien*.

The Ordinance also satisfies the third prong of *O'Brien* because, as discussed *supra*, the City's interest is unrelated to the suppression of free expression. *See Pap's A.M.*, 120 S.Ct. at 1397.

The fourth and final prong of *O'Brien* is also satisfied here, since the restriction on expressive conduct is no greater than is essential to the furtherance of the City's interest. In reaching this conclusion, we are largely bound by (and in any event agree with) our prior opinion in *LLEH*, in which we held that an ordinance with identical buffer-zone, stage-height, and demarcation requirements satisfied *O'Brien*'s fourth prong. The *LLEH* court explained that "such regulations are not invalid simply because there is some imaginable alternative that might be less burdensome on speech" so long as the "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *LLEH*, 289 F.3d at 367 (quoting *United States v.*

30

*Albertini*, 105 S.Ct. 2897, 2906 (1985)) (emphasis omitted). The only relevant difference between this ordinance and the one at issue in *LLEH* is that the Arlington ordinance also contains a six-foot tipping restriction. This restriction also satisfies prong four, however, because it "is simply a manifestation of the buffer provision; it furthers the same substantial interests . . . . [I]t imposes no further restriction on speech." *LLEH*, 289 F.3d at 368-69 (discussing the demarcation requirement).

Appellants respond, first, that *LLEH*'s narrow-tailoring standard was overruled by Justice Kennedy's concurrence in *Alameda Books*, and, second, that under either standard the ordinance is unconstitutional, since it *completely* bans a unique form of expression, proximate nude dancing.

We disagree with the appellants' contention that *LLEH* is no longer good law. The question of narrow tailoring was not before the Court in *Alameda Books*; rather, the Court "granted certiorari to clarify the standard for determining whether an ordinance serves a substantial government interest under *Renton*." *Alameda Books*, 122 S.Ct. at 1733 (citations omitted). That question is relevant only to issues discussed above respecting *O'Brien* prongs two and three.

But even if Justice Kennedy's concurrence has tightened the narrow tailoring standard of *Renton*,[9] it is not clear that this

_____

[9]The appellants refer to the following language from Justice Kennedy's concurrence: "[A] city must advance some basis to show

31

purportedly new standard, which was formulated for zoning cases, would apply here, in a symbolic-speech case. Indeed, only two years before *Alameda Books*, in a symbolic-speech case, a plurality that included Justice Kennedy applied the very same "loose" narrow-tailoring requirement that we do today, holding "[t]he fourth *O'Brien* factor [is] that the restriction is no greater than is essential to the furtherance of the government interest," and concluding "since this is a content-neutral restriction, least restrictive means analysis is not required." *Pap's A.M.*, 120 S.Ct. at 1386, 1397. In any event, the ordinance before us satisfies even the more strict standard proposed by appellants.

Thus we also disagree with the appellants' second argument, presented through their expert witness, Dr. Hanna, that the ordinance enacts a *complete* ban on *proximate* nude dancing.[10] The Supreme Court rejected a very similar argument when it was made by the dissenters in *Pap's A.M.*, who argued that a pasties and G-string requirement completely silenced the erotic message

_____

that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact. . . . [A] city may not attack secondary effects indirectly by attacking speech." *Alameda Books*, 122 S.Ct. at 1742.

[10] Dr. Hanna's "proximate nude dancing" theory could presumably *not* validly preclude a touching ban, as such bans having been universally upheld, but *would* (in appellants' view) preclude *any* distance restriction, so that nude dancers could not constitutionally be forbidden from coming within even an inch (or less) from patrons so long as they did not actually touch them.

32

associated with fully nude dancing. The plurality responded, "[S]imply to define what is being banned as the 'message' is to assume the conclusion. . . . Any effect on the overall expression is *de minimis*." *Pap's A.M*, 120 S.Ct. at 1393. Moreover, in *Colacurcio*, the Ninth Circuit rejected an identical argument, made through the very same Dr. Hanna, while holding that a ten-foot buffer zone, a two-foot stage-height requirement, and a tipping ban were all sufficiently narrow-tailored. *Colacurcio v. City of Kent*, 163 F.3d 545, 555-57 (9th Cir. 1998), *cert. denied*, 529 U.S. 1053 (2000).

Here too we hold that the effect on the overall expression is *de minimis*, as the City of Arlington has muted only that portion of the expression that occurs when the six-foot line is crossed, while leaving the erotic message largely intact. Indeed, in *Barnes*, all nine members of the Supreme Court agreed that a buffer zone would meet narrow tailoring requirements. Writing for the dissent, Justice White argued that the ordinance at issue, which banned all public nudity, was "not narrowly drawn." *Barnes v. Glen Theatre, Inc.*, 111 S.Ct. 2456, 2475 (1991). The dissenters continued, "If the State is genuinely concerned with prostitution and associated evils . . . it can adopt restrictions that *do not interfere* with the expressiveness of nonobscene nude dancing performances. For instance, the State could perhaps require that, while performing, nude performers remain at all times a certain minimum distance from

33

spectators . . . ." *Id.* (emphasis added). Accordingly, we hold that the proximity provisions of the challenged ordinances satisfy all four prongs of *O'Brien*, and thus are a constitutional regulation of symbolic speech.

II. Prior Restraint

Fantasy Ranch also contends that the ordinance's license-revocation provision is incompatible with the First Amendment because it imposes a prior restraint on symbolic speech. In *Universal Amusement Co., Inc. v. Vance*, this court held that a Texas nuisance statute, which authorized the one-year revocation of an adult theater's license on the basis of a prior finding of obscenity, constituted an impermissible prior restraint, "since the state would be enjoin[ing] the future operation of [a business] which disseminates presumptively First Amendment protected materials solely on the basis of the nature of the materials which were sold . . . in the past."  587 F.2d 159, 166 (5th Cir. 1978) (*en banc*) (internal quotations omitted).[11]

The license revocation provision in this case differs from a prior restraint in two respects. "First, the [revocation] would impose no restraint at all on the dissemination of particular materials, since respondents are free to carry on their . . . business at another location, even if such locations are difficult

_____

[11]*See also, e.g., Entertainment Concepts, Inc. III v. Maciejewski*, 631 F.2d 497, 506 (7th Cir. 1980).

34

to find," and, "second, the closure order sought would not be imposed on the basis of an advance determination that the distribution of particular materials is prohibited — indeed, the imposition of the closure order has nothing to do with any expressive conduct at all." *Arcara v. Cloud Books, Inc*., 106 S.Ct. 3172, 3177 n.2 (1986).

Unlike the provision in *Vance*, which prohibited the showing of any film for one year, Fantasy Ranch is not prohibited from obtaining another SOB license (for another location) during the pendency of any license suspension or revocation. This is because Fantasy Ranch's license revocation would have been related, not to an advance determination that the content of its speech would be prohibited, but to the adverse secondary effects generated by Fantasy Ranch at its particular extant location.

To the extent that the license revocation provision does burden Fantasy Ranch's expressive liberties, we find that burden justified. In *Freedman v. Maryland*, 85 S.Ct. 734 (1965), the Supreme Court established three procedural safeguards to protect against the suppression of constitutionally protected speech by a censorship board. "First, any restraint before judicial review occurs can be imposed only for a specified brief period during which the status quo must be maintained; second, prompt judicial review of that decision must be available; and third, the censor must bear the burden of going to court to suppress the speech and

35

must bear the burden of proof in court." *N.W. Enterprises*, 352 F.3d at 193–94 (citing *Freedman*, 85 S.Ct. at 739).

The Arlington Ordinance contains all three safeguards, first, providing for a stay of suspension pending the appeals process, §§ 4.07(B)(3), 4.09; second, providing a hearing before an administrative law judge with an appeal to a Texas district court, §§ 4.07(B)(5), 4.09; and third, placing the burden of proof on the City, § 4.07(A). In fact, by this last provision, the City has provided for more procedural protection than our case law requires. Indeed, in *N.W. Enterprises* we held that the burden of proof need not be placed upon the City in cases where the licensing involved "the ministerial, nondiscretionary act of reviewing the general qualifications of license applicants" and not the "presumptively invalid direct censorship of expressive material." 352 F.3d at 194 (citing *FW/PBS, Inc. v. City of Dallas*, 110 S.Ct. 596 (1990) (plurality opinion); *see also Encore Videos, Inc. v. City of San Antonio*, 310 F.3d 812, 823 (5th Cir.2002); *TK's Video, Inc. v. Denton County, Texas*, 24 F.3d 705 at 707, 708 (5th Cir. 1994); *MacDonald v. City of Chicago*, 243 F.3d 1021, 1035-36 (7th Cir.2001). The presumption of censorship does not apply here because the City of Arlington's revocation procedures do not require it to pass judgment on the content of an SOB's speech; rather, the procedures enumerate non-speech related criminal violations on which a license revocation or suspension must be

36

predicated. Arlington, Tex., Ordinance 03-044, § 4.06.

Moreover, these enumerated violations are "'plainly correlated with the side effects that can attend [adult] businesses, the regulation of which was the legislative objective . . . [E]nds and means are substantially related[,] . . . assur[ing] a level of scrutiny appropriate to the protected character of the activities and sluic[ing] regulation away from content, training it on business offal.'" *N.W. Enterprises*, 352 F.3d at 196 (quoting *TK's Video*, 24 F.3d at 710). Accordingly, we hold that the Ordinance's license revocation provision does not impose an unconstitutional prior restraint on speech.

III. Due Process

Fantasy Ranch appeals the district court's dismissal as moot of its due process claims against the City's pre-amendment ordinance. A court may conclude that voluntary cessation has rendered a case moot if the party urging mootness demonstrates that "there is no reasonable expectation . . . that the alleged violation will recur," and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis*, 99 S.Ct. 1379, 1383 (1979).

The City's amended ordinance addresses all the issues raised by Fantasy Ranch's pre-amendment complaint, leaving Fantasy Ranch only with the claim that the Arlington City Council might one day

amend the ordinance to reenact the offending provisions. As the Fourth Circuit has noted, however, "statutory changes that discontinue a challenged practice are 'usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.'" *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 116 (4th Cir.2000) (quoting *Native Village of Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir.1994)); *see also National Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C.Cir.1997) ("the mere power to reenact a challenged law is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists"). We hold, therefore, that Fantasy Ranch's challenge to the pre-amendment ordinance is moot.

Fantasy Ranch also challenges the post-amendment ordinance, specifically, its provision for revoking an SOB license after four suspensions, because that revocation provision does not expressly exclude from its four-suspension limit any suspensions that were imposed under the pre-amendment ordinance. Indeed, Fantasy Ranch notes that it already has one (and only one) such pre-amendment suspension in its name. However, in open court, the City has promised to neither enforce that three-day suspension imposed under the pre-amendment scheme, nor apply it toward the four total that are necessary to revoke an SOB license, and Fantasy Ranch's counsel agreed that this satisfied its concerns in that particular respect.

38

We accordingly also hold that this due-process challenge to the post-amendment ordinance is likewise moot. To the extent that Fantasy Ranch makes other due process challenges to the post-amendment ordinance we reject them, essentially for the reasons stated in part II above.[12]

The judgment of the district court is accordingly

AFFIRMED.

---

[12]We also note that Fantasy Ranch has identified nothing in the ordinance that deprives them of notice or a hearing, although they allege, incorrectly, that the ordinance provides no notice to the club when a dancer has been cited for a violation. In fact, the ordinance provides that "[t]he City shall send to a Sexually Oriented Business written notice of each citation issued to an operator or employee of the business . . . . The notice will be sent within three (3) business days of the issuance of the citation . . . ." Arlington, Tex., Ordinance 03-044, § 7.02. Moreover, contrary to Fantasy Ranch's claim, the ordinance provides an adequate tribunal, consisting of a hearing before an administrative law judge and an appeal before a Texas district court. Arlington, Tex., Ordinance 03-044, §§ 4.07, 4.09. *See also* part B2b above (The Post-Amendment Licensing Provisions).

39