287 S.W.3d 852 (2009)
Susan COMBS, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas, Appellants
v.
TEXAS ENTERTAINMENT ASSOCIATION, INC. and Karpod, Inc., Appellees.
No. 03-08-00213-CV.
Court of Appeals of Texas, Austin.
June 5, 2009.
*856 James C. Ho (argued), Danica L. Milios, James C. Todd, Christine Monzingo, for Susan Combs, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas.
Craig T. Enoch (argued), G. Stewart Whitehead, Peter A. Nolan, Elliot Clark, Randall D. Chapman, Douglas M. Becker, Antoinette D. "Toni" Hunter, L. Monique Gonzalez, for Texas Entertainment Association, Inc. and Karpod, Inc.
Before Chief Justice JONES, Justices PURYEAR and HENSON.

OPINION
DIANE M. HENSON, Justice.
The Comptroller of Public Accounts and the Attorney General of the State of Texas[1] appeal the trial court's judgment in a suit for declaratory and injunctive relief brought by Texas Entertainment Association, Inc. ("TEA"), and Karpod, Inc. The trial court's judgment declared subchapter B of chapter 47 of the business and commerce code unconstitutional and permanently enjoined the Comptroller from assessing or collecting the tax imposed by that subchapter.[2]See Tex. Bus. & Com. Code Ann. §§ 47.051-.056 (West Supp. 2008). Because we hold that subchapter B violates the First Amendment to the United States Constitution, we affirm the trial court's judgment.[3]See U.S. Const. amend. I.

BACKGROUND
In 2007, the Texas Legislature enacted chapter 47, subchapter B, of the business and commerce code, which imposes a tax "on a sexually oriented business in an amount equal to $5 for each entry by each customer admitted to the business." Tex. Bus. & Com.Code Ann. § 47.052(a). The statute further defines a sexually oriented business ("SOB") as:
a nightclub, bar, restaurant, or similar commercial enterprise that:
(A) provides for an audience of two or more individuals live nude entertainment or live nude performances; and

*857 (B) authorizes on-premises consumption of alcoholic beverages, regardless of whether the consumption of alcoholic beverages is under a license or permit issued under the Alcoholic Beverage Code.
Id. § 47.051(2). As a result, the tax applies only to businesses that permit alcohol consumption in the presence of live, nude entertainment. "Nude" is defined as "entirely unclothed" or "unclothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks." Id. § 47.051(1). A business subject to the tax is not required to impose the tax on its customers, but may use its discretion in determining how it will derive the money required to pay the tax. Id. § 47.052(c). The legislature allocated the first $25 million in revenue received from the SOB tax to the State's sexual assault program fund and the remaining revenue to the Texas health opportunity pool to fund health insurance for low-income Texans. Id. §§ 47.054-.055. The SOB tax went into effect on January 1, 2008.[4]
In response to the enactment of subchapter B, Karpod, a sexually oriented business, and TEA, an association representing the interests of sexually oriented businesses in Texas, filed suit for declaratory and injunctive relief against the Comptroller, asserting that the tax violated the state and federal constitutions. After a bench trial, the trial court issued a declaratory judgment that the statute violated the First Amendment to the United States Constitution, permanently enjoined the Comptroller from collecting or assessing the tax, and awarded attorneys' fees in favor of TEA and Karpod.[5] This appeal followed.

DISCUSSION
On appeal, the Comptroller argues (1) that the SOB tax does not violate the First Amendment, (2) that the SOB tax does not violate the Texas Constitution, (3) that sovereign immunity bars suit by TEA, and (4) that the trial court erred in awarding attorneys' fees.

The First Amendment
We note at the outset that "the fact that protected speech may be offensive to some does not justify its suppression." Carey v. Population Servs. Int'l, 431 U.S. 678, 701, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). In fact, "it is in those instances where protected speech grates most unpleasantly against the sensibilities that judicial vigilance must be at its height." Young v. American Mini Theatres, Inc., 427 U.S. 50, 87, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion) (Stewart, J., dissenting).
In conducting our First Amendment analysis, we must first determine whether the SOB tax is subject to strict or intermediate scrutiny. Content-based restrictions on speech are presumptively invalid and subject to strict scrutiny. See, e.g., City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 434, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality opinion). In order to withstand strict scrutiny, a statute must be narrowly tailored *858 to promote a compelling government interest. See, e.g., United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). The Comptroller concedes that the SOB tax cannot survive a strict scrutiny analysis, arguing instead that the tax is content-neutral and therefore subject to intermediate scrutiny. A content-neutral restriction on speech withstands intermediate scrutiny "if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial governmental interest, and if the interest is unrelated to the suppression of free speech." Clark v. Community for Creative Non-Violence, 468 U.S. 288, 294, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (citing United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)).
"As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based," while "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content-neutral." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). The principal inquiry in determining content neutrality "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Rules are generally considered content-based when the regulating party must examine the speech to determine if the restriction applies. See, e.g., Forsyth County v. Nationalist Movement, 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 230, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); FCC v. League of Women Voters of Cal., 468 U.S. 364, 383, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984).
While nude dancing "falls only within the outer ambit of the First Amendment's protection," it is nevertheless protected as expressive conduct. City of Erie v. Pap's A.M., 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion). In arguing that the SOB tax is subject to intermediate scrutiny, the Comptroller points to cases in which the U.S. Supreme Court has applied intermediate scrutiny to zoning restrictions aimed at the secondary effects of businesses offering adult entertainment. See Alameda Books, 535 U.S. at 434, 122 S.Ct. 1728 (plurality opinion) (zoning ordinance prohibiting more than one "adult entertainment business" in single building); Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (zoning ordinance restricting location of adult movie theaters); Young, 427 U.S. at 71-72, 96 S.Ct. 2440 (plurality opinion) (same).
Unlike the restrictions at issue in Alameda Books, Renton, and Young, the SOB tax is not a zoning restriction, but a tax on businesses that offer live, nude entertainment in the presence of alcohol.[6] The U.S. Supreme Court has suggested that zoning restrictions directed to secondary effects of speech are inherently different from other types of restrictions on speech. See Alameda Books, 535 U.S. at 449, 122 S.Ct. 1728 (plurality opinion) *859 (Kennedy, J., concurring)[7] ("[Z]oning regulations do not automatically raise the specter of impermissible content discrimination... because they have a prima facie legitimate purpose: to limit the negative externalities of land use. ... [T]hese sorts of ordinances are more like a zoning restriction on slaughterhouses and less like a tax on unpopular newspapers.") (emphasis added); Young, 427 U.S. at 62, 73 n. 35, 96 S.Ct. 2440 (plurality opinion) (stating that the zoning ordinance's restrictions are so minimal that "the market for this commodity is essentially unrestrained" and that "[t]he situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech"). Because zoning ordinances are distinguishable from other restrictions on speech, we do not find the First Amendment analyses applied in zoning cases to be particularly relevant to the present case. See Alameda Books, 535 U.S. at 445, 122 S.Ct. 1728 (plurality opinion) (Kennedy, J., concurring) (stating that city could regulate secondary effects of adult entertainment businesses with zoning ordinance, but could not suppress the speech itself by, "for example, imposing a content-based fee or tax").
Furthermore, while the Supreme Court has held that bans on public nudity should be reviewed with intermediate scrutiny as content-neutral restrictions, the public-nudity bans at issue in those cases did not single out a specific class of First Amendment speakers, as the SOB tax does. See Pap's A.M., 529 U.S. at 290, 120 S.Ct. 1382 (plurality opinion) ("By its terms, the ordinance regulates conduct alone. It does not target nudity that contains an erotic message; rather, it bans all public nudity, regardless of whether that nudity is accompanied by expressive activity."); Barnes v. Glen Theatre, Inc., 501 U.S. 560, 566, 571, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion) ("Indiana, of course, has not banned nude dancing as such, but has proscribed public nudity across the board. ... Public nudity is the evil the State seeks to prevent, whether or not it is combined with expressive activity.").
Having found the cases involving zoning restrictions and total nudity bans inapplicable to the present case, we now turn to the body of law addressing differential taxation of First Amendment speakers. The SOB tax targets a small group of taxpayers engaged in expression protected by the First Amendment, even if only marginally so. See Barnes, 501 U.S. at 566, 571, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion). A tax imposed on a small group of First Amendment speakers, particularly a group conveying a message that the taxing body might consider undesirable, carries a greater risk of suppressing speech than a zoning ordinance because "the power to tax involves the power to destroy." McCulloch v. Maryland, 4 Wheat. 316, 17 U.S. 316, 431, 4 L.Ed. 579 (1819). As the Supreme Court stated in Leathers v. Medlock:
[D]ifferential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints.... A tax is also suspect if it *860 targets a small group of speakers. Again, the fear is censorship of particular ideas or viewpoints. Finally, for reasons that are obvious, a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech.
499 U.S. 439, 447, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991) (citations omitted). "A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected." Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue, 460 U.S. 575, 585, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983).
A selective taxation scheme in which an entity's tax status depends entirely on the content of its speech is "particularly repugnant to First Amendment principles." Arkansas Writers' Project, 481 U.S. at 229, 107 S.Ct. 1722. As a result, differential taxation based on content is subject to strict scrutiny. Id. at 231. A taxing statute is content-based if it "singles out income derived from expressive activity for a burden the State places on no other income, and it is directed only at works with a specified content." Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). Where taxing authorities must necessarily examine the content of the message that is conveyed, "[s]uch official scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible" with the First Amendment. Arkansas Writers' Project, 481 U.S. at 230, 107 S.Ct. 1722.
Testimony at trial revealed that in order to determine whether the SOB tax should be assessed against a particular taxpayer, representatives from the Comptroller's office would be required to examine the content of the expressive conduct. For example, Steven White, a program specialist in the Comptroller's tax policy division, testified that if a play involving nudity was held at a bar or other establishment that serves alcohol, the owner of the establishment would not be subject to the SOB tax because "the main ingredient of the performance is not necessarily that of live nude entertainment." White also testified that a comedy show involving nudity at a venue where alcohol is sold would not trigger the SOB tax, because "the essence of that performance is not necessarily one of live nude entertainment." White further explained that a bar hosting a "wet t-shirt contest" or a bar at which bartenders periodically perform dance routines and become nude as defined by the statute would be subject to the tax. Similarly, Emma Fuentes, an auditor in the Comptroller's office testified, "Using my own judgment, I would look at the taxpayer we're auditing. If it's like a theater that puts on plays and concerts I would think that maybe this fee was not appropriate for them ... [b]ecause the whole essence of the transaction to me would be for somebody to go see a play and not so much a sexually oriented business." These examples reveal that the SOB tax is not imposed in all incidents where live nude entertainment occurs in the presence of alcohol, but only in those situations in which the taxing authoritythe Comptrollerdetermines, after examining the content of the expression, that it represents the "essence" of live nude entertainment. This type of differential taxation based on content is precisely the type of restriction warranting strict scrutiny in Arkansas Writers' Project, Minneapolis Star, and Simon & Schuster.
The bulk of the testimony at trial focused on the Comptroller's argument that the SOB tax is aimed at reducing the secondary effects of sexually oriented businesses. *861 However, a tax on speech is not necessarily content-neutral simply because it is aimed at secondary effects. See Forsyth County, 505 U.S. at 134, 112 S.Ct. 2395. While intermediate scrutiny is applied to zoning regulations aimed at decreasing secondary effects, zoning regulations are distinguishable from differential taxation statutes, as previously discussed. See Alameda Books, 535 U.S. at 449, 122 S.Ct. 1728 (plurality opinion) (Kennedy, J., concurring) (stating that designation of zoning restrictions on adult entertainment businesses as "content-neutral" is legal fiction used because "[t]he zoning context provides a built-in legitimate rationale, which rebuts the usual presumption that content-based restrictions are unconstitutional"). In light of this distinction, evidence that the SOB tax is aimed at reducing secondary effects of sexually oriented businesses does not preclude the proper application of strict scrutiny in this case.
The Comptroller also argues that the State has the power to categorically ban nude dancing or the sale of alcohol in the presence of nude dancing, and therefore the SOB tax must be constitutionally permissible because it is less restrictive than a total ban. First, the Supreme Court cases relied upon by the Comptroller for the proposition that the State may ban nude dancing altogether refer, as previously discussed, to content-neutral bans on nudity in general, rather than specific prohibitions on nude dancing. See Pap's A.M., 529 U.S. at 290, 120 S.Ct. 1382 (plurality opinion); Barnes, 501 U.S. at 566, 571, 111 S.Ct. 2456 (plurality opinion). Second, with regard to the power to ban alcohol in the presence of nude dancing, the Supreme Court held in 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 516, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), that "the Twenty-first Amendment does not qualify the constitutional prohibition against laws abridging the freedom of speech embodied in the First Amendment." In other words, a state's regulatory power over the sale and use of alcoholic beverages under the Twenty-first Amendment cannot be used to shield the suppression of speech from constitutional scrutiny. See id.[8]
Furthermore, we disagree with the Comptroller's a fortiori argument that if a government may, in the interest of public safety, ban alcohol in the presence of nude dancing, it may also impose a tax on establishments that provide alcohol in the presence of nude dancing. The reason this argument fails is best addressed by the following analogy posited by the U.S. Supreme Court:
[T]he situation becomes the same as if California law forbade shouting fire in a crowded theater, but granted dispensations to those willing to contribute $100 to the state treasury. While a ban on shouting fire can be a core exercise of the State's police power to protect the public safety, and can thus meet even our stringent standards for regulation of speech, adding the unrelated condition alters the purpose to one which, while it may be legitimate, is inadequate to sustain the ban. Therefore, even though, in *862 a sense, requiring a $100 tax contribution in order to shout fire is a lesser restriction on speech than an outright ban, it would not pass constitutional muster.
Nollan v. California Coastal Comm'n, 483 U.S. 825, 837, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). As this hypothetical suggests, the power to ban speech pursuant to a government's police power does not presuppose the power to impose a financial disincentive on such speech. This reasoning is even more applicable in the present case because the act of shouting fire in a crowded theater, unlike nude dancing, is not subject to First Amendment protection at all. See Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919).
The Supreme Court has held that while a government has the power to regulate the use and sale of alcohol, it "may not deny a benefit to a person on a basis that infringes his constitutionally protected interestsespecially his interest in freedom of speech." 44 Liquormart, 517 U.S. at 513, 116 S.Ct. 1495 (internal quotation marks and citation omitted). "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to `produce a result which [it] could not command directly.'" Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)). This is precisely what the State seeks to do in the present case. By conditioning the ability to sell alcohol on the forfeiture of a First Amendment right, the State attempts to produce a resultthe imposition of a content-based tax on speechwhich it could not command directly.[9]
Furthermore, we disagree with the Comptroller's characterization of the SOB tax as an alcohol regulation, rather than a tax on speech. While it is true that a sexually oriented business owner may avoid the tax by choosing not to allow the consumption of alcohol on the premises, this aspect of the SOB tax is insufficient to transform a content-based tax into a content-neutral alcohol regulation. In reviewing the plain language, context, and legislative history of the relevant statutory provisions, we are not convinced that "the statute's predominant purpose is with regulating the service of alcohol," as was the case in Illusions-Dallas Private Club, Inc. v. Steen, 482 F.3d 299, 309 (5th Cir.2007), in which the Fifth Circuit applied intermediate scrutiny to a provision of the Texas Alcoholic Beverage Code prohibiting sexually oriented businesses from obtaining private club permits from the Texas Alcoholic Beverage Commission (TABC) to serve alcohol in dry counties. See Tex. Alco. Bev.Code Ann. § 32.03(k) (West 2007). In Illusions, the Fifth Circuit held that the statute at issue was "part of a `web' of alcohol regulations," which are unrelated to the suppression of speech, and emphasized the statutory context of the prohibition within the alcoholic beverage code, where it appears alongside other provisions allowing TABC to regulate the sale of alcohol. 482 F.3d at 309; see also id. at 308 (concluding "that § 32.03(k) is *863 subject to intermediate scrutiny because its predominant purpose, as exhibited by its plain text and its place within the Texas Alcoholic Beverage Code, is unrelated to the suppression of speech").
The SOB tax, on the other hand, is not part of a "web" of alcohol regulations imposed by the alcoholic beverage code, but appears in chapter 47 of the business and commerce code, which governs sexually oriented businesses. The SOB tax is remitted to the Comptroller, see Tex. Bus. & Com.Code Ann. § 47.053, and, unlike the statutory provision at issue in Illusions, does not involve the regulatory oversight of TABC.[10] The original version of the SOB tax proposed in the legislature and passed by the House of Representatives made no mention of alcohol at all. See Tex. H.B. 1751, 80th Leg., R.S. (2007) (as passed by House, May 9, 2007). The bill was later amended in the Senate to restrict the pool of taxpayers to those sexually oriented businesses that allowed alcohol on the premises. See S.J. of Tex., 80th Leg., R.S. 3043 (2007). As TEA and Karpod point out in their briefs, this change mirrored a similar amendment originally proposed in the House, see H.J. of Tex., 80th Leg., R.S. 3573 (2007), after a hearing before the House Ways and Means Committee, in which there was some discussion regarding the additional audit burden that the SOB tax would impose on the Comptroller's office, the convenience of "joining forces" with TABC for audit purposes, and the logistical difficulties in auditing sexually oriented businesses that are not regulated by TABC.[11]See Hearing on Tex. H.B. 1751 Before the House Comm. on Ways & Means, 80th Leg., R.S. 39-42 (March 14, 2007). Beyond this discussion regarding the efficiency and convenience of combining the audit resources of TABC and the Comptroller's office, the legislative history of subchapter B of chapter 47 of the business and commerce code includes no references to the regulation of alcohol.
Reviewing the SOB tax provisions in their statutory context, we conclude that, unlike the provision at issue in Illusions, the predominant purpose of the SOB tax is not to regulate the service of alcohol. See 482 F.3d at 309, 310 n. 7 (concluding that statute has predominant purpose of regulating alcohol and is therefore content-neutral because "the text of the statute and its statutory context" suggest that it "is more in the nature of a typical alcohol regulation" and less in the nature of a law suppressing speech). Despite the limitation of *864 the SOB tax burden to businesses that allow the consumption of alcohol, the SOB tax remains a content-based differential tax burden on protected speech, and is subject to strict scrutiny. See, e.g., Arkansas Writers' Project, 481 U.S. at 230, 107 S.Ct. 1722 (stating that such tax burdens are "entirely incompatible" with First Amendment).
The Comptroller concedes that the SOB tax cannot withstand strict scrutiny. As the trial court stated in its judgment, "Defendants failed toand conceded that they cannotmeet their burden to show that [the tax] is necessary to serve a compelling state interest and narrowly tailored for that purpose." In light of the Comptroller's concession and our determination that the SOB tax is a content-based tax subject to strict scrutiny, we hold that the SOB tax is unconstitutional under the First Amendment.[12] The Comptroller's first issue is overruled. Having found the SOB tax unconstitutional under the First Amendment, we need not reach the Comptroller's second issue regarding Karpod and TEA's state constitutional claims.

Sovereign Immunity
In its third issue on appeal, the Comptroller argues that TEA, as an organization that is not subject to the SOB tax, is barred from bringing suit on the basis of sovereign immunity. See State v. Holland, 221 S.W.3d 639, 643 (Tex.2007) ("Absent an express waiver of its sovereign immunity, the State is generally immune from suit."). The Comptroller asserts that TEA cannot take advantage of the waiver of sovereign immunity found in the tax-protest provisions of the tax code because these provisions apply only to taxpayers. See Tex. Tax Code Ann. §§ 112.052, .101 (West 2008); see also Rylander v. Bandag Licensing Corp., 18 S.W.3d 296, 302 (Tex. App.-Austin 2000, pet. denied) ("The Tax Code provides a statutory remedy for taxpayers who contend a tax is unlawful or may not legally be demanded.").
While the tax code does provide a remedy for taxpayers seeking to challenge the legality of a tax, such a challenge may also be brought in a suit for declaratory relief under the Texas Uniform Declaratory Judgments Act (UDJA), *865 Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001-.011 (West 2008), as TEA has done in the present case. See Bandag Licensing, 18 S.W.3d at 303. This Court has held that "[a] suit seeking a declaratory judgment that a state agent is acting pursuant to an unconstitutional law is not an action against the State barred by sovereign immunity." Rylander v. Caldwell, 23 S.W.3d 132, 136 (Tex.App.-Austin 2000, no pet.).[13] Declaratory-judgment actions against state officials challenging the constitutionality of a statute "do not implicate the sovereign-immunity doctrine" because they are not considered "suits against the State." Texas Natural Res. Conservation Com'n v. IT-Davy, 74 S.W.3d 849, 855 (Tex.2002). Because the present case falls within this category of cases for which the sovereign-immunity doctrine does not apply, we hold that TEA is not barred from bringing suit.[14] The Comptroller's third issue on appeal is overruled.

Attorneys' Fees
In its fourth issue on appeal, the Comptroller argues that Karpod is not entitled to attorneys' fees under the UDJA because its UDJA claim is redundant to the legal remedy provided by the tax-protest provisions of the tax code. See Tex. Tax Code Ann. §§ 112.052, .101. The Comptroller contends that Karpod improperly brought its UDJA claim solely as a vehicle to obtain attorneys' fees. See Texas State Bd. of Plumbing Exam'rs v. Associated Plumbing-Heating-Cooling Contractors of Tex., Inc., 31 S.W.3d 750, 753 (Tex.App.-Austin 2000, pet. dism'd by agr.) ("It is an abuse of discretion ... to award attorney's fees under the UDJA when the statute is relied upon solely as a vehicle to recover attorney's fees.").
Chapter 112 of the tax code allows taxpayers to seek a return of taxes paid under protest, see Tex. Tax Code Ann. § 112.052, and an injunction prohibiting the assessment or collection of a tax, see id. § 112.101.[15] If a party requests a declaration under the UDJA that goes beyond its request pursuant to the tax code, the UDJA claim is not considered a redundant remedy. See Strayhorn v. Raytheon E-Systems, Inc., 101 S.W.3d 558, 572 (Tex. App.-Austin 2003, pet. denied) (distinguishing between taxpayer that "requested a statutory interpretation that went beyond its request for a tax refund," for which UDJA claim would not be redundant, and taxpayer seeking declaration that denial of refund claim was unlawful, for which UDJA claim would be redundant). In addition, the issues to be determined in a tax-protest suit "are limited to those arising from the reasons expressed in the *866 written protest as originally filed." Tex. Tax Code Ann. § 112.053(b) (West 2008). At the time of trial, Karpod had not paid the SOB tax under protest or filed a written protest as contemplated by section 112.053 because the first SOB tax payments were not yet due.[16] Therefore, when Karpod's UDJA claim was filed, the constitutionality of the SOB tax was not yet a "reason[] expressed in the written protest" that could be raised in a tax-protest suit.[17]Id. The Texas Supreme Court has held that taxpayers have a constitutional right to obtain judicial review of tax liability by means of a prepayment declaratory action. See R Commc'ns, Inc. v. Sharp, 875 S.W.2d 314, 317-18 (Tex. 1994) (holding tax code provision prohibiting declaratory actions and requiring taxpayers to seek relief through protest suit to be unconstitutional); see also Bandag Licensing, 18 S.W.3d at 305 (tax code provision prohibiting award of attorneys' fees in declaratory-judgment action is "an unconstitutional barrier to access to the courts"). At the time Karpod's UDJA claim was filed, it had a constitutional right to a declaratory judgment regarding its tax liability and such a declaration was not redundant to any remedy available under the tax code. As a result, the trial court did not abuse its discretion in awarding attorneys' fees under the UDJA. The Comptroller's fourth issue is overruled.

CONCLUSION
We affirm the trial court's judgment declaring that subchapter B of chapter 47 of the business and commerce code is unconstitutional and permanently enjoining assessment and collection of the tax.
Concurring Opinion by Chief Justice JONES.
Dissenting Opinion by Justice PURYEAR.

CONCURRING OPINION
J. WOODFIN JONES, Chief Justice.
Although I agree that strict scrutiny is the appropriate standard to apply in this case and concur in the decision to affirm the trial court's judgment, I write separately to address the issue raised by the parties concerning the use and relevance of post-enactment evidence in determining the statute's predominant purpose.
Our First Amendment analysis proceeds in three parts. See City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 434, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality op.) (citing City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 46, 47-49, 51-54, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)). The first question, whether the challenged law imposes a complete ban or is instead a "time, place, and manner" regulation, see id., is not in contention here, as the parties agree that the fee or tax at issue is the latter. The second question in the analysis is whether the restriction is content-neutral or content-based, see id.; the answer to this question determines what level of scrutiny should be applied, see City of Erie v. Pap's A.M., 529 U.S. 277, 278, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality op.). A content-based *867 regulation is considered presumptively invalid and is subject to strict scrutiny. Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd., 502 U.S. 105, 115, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991); Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 230-31, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987). Government regulation of speech or other expressive activity is content-neutral and subject only to intermediate scrutiny if it is adopted not "because of disagreement with the message it conveys," but for reasons unrelated to the content of the speech. Hill v. Colorado, 530 U.S. 703, 720, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (citing Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). Even in cases when a regulation has an incidental effect on some speakers or messages but not others, however, it will be deemed content-neutral and reviewed under intermediate scrutiny if its predominant purpose was aimed at perceived harmful secondary effects of the speech, rather than at its content. Alameda Books, 535 U.S. at 434, 122 S.Ct. 1728; City of Renton, 475 U.S. at 48-49, 106 S.Ct. 925. After determining the level of scrutiny, the third part of the analysis involves applying the appropriate constitutional standard to decide whether the regulation is narrowly tailored to promote a compelling governmental interest (strict scrutiny), see Arkansas Writers' Project, 481 U.S. at 231, 107 S.Ct. 1722, or narrowly drawn to further a substantial governmental interest unrelated to the suppression of free speech (intermediate scrutiny), see Turner Broad. Sys. v. Federal Commc'ns Comm'n, 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).
I agree with Justice Henson that, in the present case, the level-of-scrutiny inquiry (i.e., "question two") can properly be decided by considering the plain text of the statute at issue and its statutory context. See, e.g., Illusions-Dallas Private Club, Inc. v. Steen, 482 F.3d 299, 310 (5th Cir. 2007) (holding that statute's predominant purpose could be determined by considering text and statutory context). In addition to those factors, I believe it is also appropriate at this stage of the inquiry to look beyond whether the statute is content-based or content-neutral on its face and consider evidence regarding whether the statute's predominant purpose was to regulate speech or to address secondary effects. See City of Renton, 475 U.S. at 48-49, 106 S.Ct. 925. To the extent that Justice Henson's opinion suggests that secondary-effects analysis is or should be confined strictly to cases involving zoning regulations, I do not adopt that view. Given that, in determining the content neutrality of any statute under the First Amendment, "[t]he government's purpose is the controlling consideration," Ward, 491 U.S. at 791, 109 S.Ct. 2746, it would be unwise to ignore evidence regarding whether the government's actual purpose was to combat negative secondary effects. Accordingly, I see no reason to analyze and decide cases in which protected speech is regulated through imposition of a tax any differently from cases in which it is regulated by a zoning restriction or other means.
As the Eleventh Circuit has observed, while the Supreme Court has stated that zoning ordinances and public-nudity ordinances should be reviewed under distinct standards, "the Court also has sometimes collapsed the two categories into a single, overarching category of regulatory action targeting the negative `secondary effects' of non-obscene adult entertainment and drawn conclusions about this single category." Peek-A-Boo Lounge of Bradentown, Inc. v. Manatee City, 337 F.3d 1251, 1255 (11th Cir.2003). "Additionally, the Court has occasionally borrowed specific doctrines *868 developed in one category of case to apply to the other." Id. at 1255-56 (citing Alameda Books, 535 U.S. at 434, 122 S.Ct. 1728 (plurality op.) (relying on Court's holding in Pap's A.M., a case involving public-nudity ordinance, to explicate evidentiary showing necessary to sustain adult-entertainment zoning ordinance); Barnes v. Glen Theatre, Inc., 501 U.S. 560, 583-84, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (Souter, J., concurring) (relying on evidentiary standard described in Renton, a zoning case, to explicate evidentiary showing necessary to sustain public-nudity ordinance)).[1] Therefore, I would hold that the Renton test may be applied here and that question two of that test may be decided by considering evidence relevant to the issue of whether the legislature's predominant purpose in enacting the statute was to address secondary effects.
In the present case, the trial court made several written fact findings relating to the absence of evidence that the statute's predominant purpose was to combat secondary effects of combining nude dancing and alcohol:
The author of HB 1751, State Representative Ellen Cohen, testified before the House Ways & Means Committee that she claimed no link between sexual assault and the businesses responsible for the fees to be paid.
The House Research Organization's Bill Analysis claimed no link between sexual assault and the business responsible for the fees to be paid.
There is no evidence that the Legislature actually considered or saw any studies claiming a link between sexual assault and the sexually oriented businesses that are responsible for the SOB Tax.
Victoria Camp's testimony indicated that materials supporting the existence of such links were made available to certain legislators, but no evidence showed that any legislator had actually considered or even seen those materials.
There is no evidence that studies about sexually oriented businesses were created, consulted, or reviewed by the Legislature prior to enacting HB 1751.
The State does not challenge those findings in this appeal. The trial court also made the following conclusion of law:
If reliance by the Legislature on some pre-enactment evidence of links between secondary effects and protected speech is a constitutional requirement (as is suggested, not expressly held, by Supreme Court case law), the SOB Tax must be held unconstitutional because no evidence indicating that the Legislature *869 actually considered any evidence of such links was presented at trial.
The State argues that, in making the foregoing findings and conclusion, the trial court created a "false distinction" between pre- and post-enactment evidence, which led it to determine that the State's "evidence of a link between the combination of alcohol and nude dancing and sexual assault" was insufficient. Relying on Justice Souter's concurring opinion in Barnes and two Fifth Circuit decisions, see Fantasy Ranch, 459 F.3d at 560; N.W. Enters. Inc. v. City of Houston, 352 F.3d 162, 175 (5th Cir.2003), the State argues that the Supreme Court has never required the government to produce "pre-enactment evidence" of legislative purpose in order to meet its burden of showing that a statute is content-neutral. The State's reliance on these cases is inapposite.
While Justice Souter did urge that "the appropriate focus is not an empirical enquiry into the actual intent of the enacting legislature, but rather the existence or not of a current governmental interest in the service of which the challenged application of the statute may be constitutional," see id. at 582, 111 S.Ct. 2456, his comments were made in the context of a discussion of question three of the Renton analysis whether the government satisfied the intermediate-scrutiny standard by producing sufficient evidence of a link between the challenged regulation and the asserted interest in combating secondary effects. Likewise, the statements in the cited Fifth Circuit cases regarding the use of post-enactment evidence were made in the context of question-three discussions.[2] But inquiring into whether a statute's purpose was to address secondary effects is wholly distinct from inquiring into whether the statute can be justified on the basis that it actually furthers an important or substantial governmental interest in combating negative secondary effects; the former determines the level of scrutiny to be applied, while the latter determines whether the statute passes constitutional muster under the applicable standard. Although I agree that post-enactment evidence may be considered in answering question three, and is often essential to that inquiry, it is far from clear that post-enactment evidenceeven evidence directly relevant to purposemay properly be considered in answering question two. See, e.g., Illusions, 482 F.3d at 310 n. 7 (declining to address question of whether district court erred in relying on state's post-enactment assertion of secondary-effects purpose as basis for applying intermediate scrutiny, having decided that statute was content-neutral based on its plain text and statutory context); White River Amusement Pub, Inc. v. Town of Hartford, 481 F.3d 163, 171-72 (2d Cir.2007) (concluding that Renton permits consideration only of pre-enactment evidence at question-two stage); Dream Palace, 384 F.3d at 1013-14 (same); Peek-A-Boo Lounge, 337 F.3d at 1268 & n. 16 (same); SOB, Inc. v. County of Benton, 317 F.3d 856, 862 (8th Cir.2003) (same); D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 57-58 (1st Cir.1999) (same); Z.J. Gifts D-2, L.L.C. v. City of Aurora, 136 F.3d 683, 690 (10th Cir.1998) (same).
Irrespective of whether courts may properly consider post-enactment evidence *870 of purpose in answering question two, however, all of the State's post-enactment evidence in this case was relevant to the issue of whether the statute can be justified (question three), not its purpose (question two). As the trial court explained in its detailed findings of fact, the record in this case does not contain evidenceeither pre- or post-enactmentthat the legislature's predominant purpose in enacting the statute was to combat perceived negative secondary effects of combining alcohol and nude dancing. Thus, the State's argument that the trial court created a false distinction between pre- and post-enactment evidence is unavailing, because no evidence was produced showing that the legislature's purpose was aimed at secondary effects.
In sum, I agree with Justice Henson that the text and context of the statute show that it is a content-based restriction. Therefore, in the absence of any evidence that the legislature's predominant purpose was to address secondary effects, the statute may not be deemed content-neutral and must be reviewed under strict scrutiny, see City of Renton, 475 U.S. at 48-49, 106 S.Ct. 925, which the State has conceded it cannot meet.
I join the "Sovereign Immunity" and "Attorneys' Fees" sections of Justice Henson's opinion.

DISSENTING OPINION
DAVID PURYEAR, Justice.
Because I believe that the statutory scheme at issue in this case should have been reviewed using intermediate scrutiny rather than strict scrutiny and because I believe that the statute does not violate the First Amendment, I respectfully dissent from the result reached by the majority.
As mentioned in Justice Henson's opinion, section 47.052 of the business and commerce code provides as follows: "A fee is imposed on a sexually oriented business in an amount equal to $5 for each entry by each customer admitted to the business." Tex. Bus. & Com.Code Ann. § 47.052(a) (West Supp.2008) (emphasis added). The code defines "sexually oriented business" as follows:
a nightclub, bar, restaurant, or similar commercial enterprise that:
(A) provides for an audience of two or more individuals live nude entertainment or live nude performances; and
(B) authorizes on-premises consumption of alcoholic beverages, regardless of whether the consumption of alcoholic beverages is under a license or permit issued under the Alcoholic Beverage Code.
Id. § 47.051(2) (West Supp.2008); see also id. § 47.051(1) (West Supp.2008) (defining "nude"). Accordingly, the code imposes a fee on businesses that provide nude erotic entertainment and permit the consumption of alcohol on the their premises. By requiring all the conditions to be satisfied before a fee may be imposed, the code necessarily exempts establishments that provide erotic entertainment but do not allow for the consumption of alcohol or that allow alcohol consumption but do not allow their erotic entertainers to perform fully nude. The code also requires that a large portion of the fee collected be given to the State's sexual assault program fund. Id. § 47.054 (West Supp.2008).

First Amendment
The statute in question, by its terms, does not specifically impose restrictions on the type of erotic entertainment performers may engage in or that patrons may observe. In other words, the statute does not address the expressive nature of the entertainment at issue. Instead, the statute affects the ability of businesses to combine *871 the entertainment and the consumption of alcohol. Although no specific limits on expression are imposed, the statute still has First Amendment implications because it affects the manner in which businesses may provide erotic expression. See Illusions-Dallas Private Club, Inc. v. Steen, 482 F.3d 299, 307 (5th Cir.2007). In light of this, I would analyze the constitutionality of the statute by employing traditional First Amendment jurisprudence; however, I would note that while this type of regulation does have First Amendment implications, live erotic entertainment "falls only within the outer ambit of the First Amendment's protection." City of Erie v. Pap's A. M., 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); see also Barnes v. Glen Theatre, Inc., 501 U.S. 560, 584, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (Souter J., concurring) (distinguishing between societal interest in protecting erotic expression and greater interest in protecting "untrammeled political debate"); Doran v. Salem Inn, Inc., 422 U.S. 922, 932, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (explaining that nude dancing at bars "involves only the barest minimum of protected expression"); Ben's Bar, Inc. v. Village of Somerset, 316 F.3d 702, 707 (7th Cir. 2003) (noting that nude dancing is only given diminished protection under First Amendment); see also Fantasy Ranch Inc. v. City of Arlington, 459 F.3d 546, 554 (5th Cir.2006) (explaining that although live erotic entertainment is protected by First Amendment, governments can regulate it).[1]

Alcohol Prohibitions for Sexually Oriented Businesses
As a preliminary matter, I would note that a state may, in an effort to combat secondary effects associated with sexually oriented businesses, entirely prohibit the consumption of alcohol within sexually oriented businesses. See Ben's Bar, 316 F.3d at 706, 728 (7th Cir.2003) (upholding constitutionality of ordinance that prohibited consumption of alcohol within sexually oriented businesses); see also 181 South Inc. v. Fischer, 454 F.3d 228, 233-34 (3d Cir. 2006) (concluding that regulation prohibiting erotic expression at locations licensed to sell alcohol did not violate First Amendment). If a state may completely prohibit the consumption of alcohol within sexually oriented businesses, it seems logical to assume that a state may also impose less exacting alcohol restrictions on sexually oriented businesses provided that the restriction is also designed to combat negative secondary effects. Cf. Pap's A.M., 529 U.S. at 301, 120 S.Ct. 1382 (upholding city ordinance that imposed restriction that was less onerous than complete ban on erotic dancing and noting that there may be more than one method for government to choose to address serious problems associated with sexually oriented businesses).
The statute at issue in this case imposes a fee on establishments providing erotic entertainment and allowing their customers to consume alcohol. There can be little doubt that a fee is less restrictive than an absolute ban,[2] and as discussed *872 more thoroughly later, the statute was designed to address potential negative secondary effects arising from the pairing of erotic entertainment and alcohol consumption by providing revenue for the State's sexual assault program fund. See 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 511, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (stating proposition that greater governmental powers include lessor ones); cf. New York State Liquor Auth. v. Bellanca, 452 U.S. 714, 717, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981) (explaining that state's ability to ban sale of alcohol entirely encompasses lesser power to ban sale of alcohol at certain locations).[3] I can find no compelling distinction between statutes designed to curb potential negative secondary effects by prohibiting, in their entirety, the pairing of alcohol consumption and erotic entertainment and statutes designed to curb unwanted secondary effects by imposing a fee on establishments allowing the two activities that would render the later unconstitutional but the former constitutional. Consequently, I fail to see how the majority can conclude that the statute at issue violates the First Amendment.

Intermediate Scrutiny Applies
Once it has been determined that a statute regulates activity protected by the First Amendment, courts must then determine what level of scrutiny to employ when reviewing the statute. As a preliminary matter, I would note that courts often apply intermediate scrutiny to governmental regulations of sexually oriented businesses. See Fantasy Ranch, 459 F.3d at 555 (5th Cir.2006) (listing various instances in which courts have applied intermediate scrutiny); see also 729, Inc. v. Kenton County Fiscal Court, 515 F.3d 485, 504 (6th Cir.2008) (explaining that regulations pertaining to sexually oriented businesses are reviewed under intermediate rather than strict scrutiny due to "the peculiar *873 `secondary effects' associated with adult businesses"). When determining whether to apply intermediate or strict scrutiny, courts look to the purpose of the regulation at issue. Illusions, 482 F.3d at 308. If the statute "is intended to suppress expressions contained in erotic dancing, then it is subject to strict scrutiny," but if the statute "has a purpose unrelated to the suppression of speech, then it is subject to intermediate scrutiny." Id.
Although the statute at issue in this case mentions "live nude entertainment" and "live nude performances," the statute imposes no direct limitation on the type of expression that may be exhibited through erotic entertainment. Cf. id. at 309 (explaining that fact that statute "references content" does not necessarily mean that statute is "intended to suppress speech, even without a legislative record to suggest a purpose unrelated to speech"). Moreover, it only imposes a fee if a sexually oriented business decides to pair erotic entertainment with the consumption of alcohol. In other words, a business may avoid any imposition of the fee described in the statute by not allowing its customers to consume alcohol. See id. (noting that fact that sexually oriented business could remove itself from reach of regulation by not allowing alcohol consumption weighs in favor of determination that regulation should be reviewed under intermediate scrutiny). Accordingly, the statute seems concerned with the regulation of alcohol or the regulation of the pairing of alcohol and erotic entertainment rather than the suppression of any specific erotic expression. Cf. Ben's Bar, 316 F.3d at 726 (explaining that regulation prohibiting consumption of alcohol within sexually oriented business was "not a restriction on erotic expression, but a prohibition of nonexpressive conduct (i.e., serving and consuming alcohol) during the presentation of expressive conduct").
For these reasons, I believe that the statute has a purpose unrelated to the suppression of expression and is, therefore, subject to intermediate scrutiny. Cf. Sammy's of Mobile Ltd. v. City of Mobile, 140 F.3d 993, 996 (11th Cir.1998) (noting that ordinances prohibiting sale or consumption of alcohol at sexually oriented business are content-neutral and should be analyzed under intermediate scrutiny).
This conclusion is also supported by the fact that courts have reviewed regulations pertaining to sexually oriented businesses and imposing more significant restrictions under intermediate scrutiny. For example, courts have employed intermediate scrutiny when reviewing regulations limiting the locations in which sexually oriented businesses may operate. See, e.g., City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 440, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality opinion) (applying intermediate scrutiny to ordinance that prohibited more than one sexually oriented business per building and did not contain a provision exempting preexisting businesses); Renton v. Playtime Theatres, Inc., 475 U.S. 41, 49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (utilizing intermediate-scrutiny test when reviewing regulation limiting the locations in which adult movie theaters may operate).
In addition, courts have also employed intermediate scrutiny when reviewing limitations placed on actual erotic expression. See, e.g., Fantasy Ranch, 459 F.3d at 557 (applying intermediate scrutiny to ordinance imposing proximity limitations, which required performers to be six feet away from customers or to be separated from their customers by wall); Hang-On, Inc. v. City of Arlington, 65 F.3d 1248, 1254-55 (5th Cir.1995) (applying intermediate scrutiny when reviewing statute prohibiting contact between erotic entertainers *874 and customers). Furthermore, the Supreme Court has applied intermediate scrutiny when reviewing the constitutionality of an ordinance prohibiting public nudity, which had the effect of requiring erotic entertainers to wear minimal attire. Pap's A.M., 529 U.S. at 296-302, 120 S.Ct. 1382.
Finally, courts have employed intermediate scrutiny to review complete bans on the consumption of alcohol within sexually oriented businesses. See Ben's Bar, 316 F.3d at 722. Similarly, intermediate scrutiny has been applied to a statute that completely prohibited the issuance or renewal of alcohol permits for sexually oriented businesses located inside dry political subdivisions. Illusions, 482 F.3d at 303, 307, 310; see Tex. Alco. Bev.Code Ann. § 32.03(k) (West 2007); see also Tex. Elec.Code Ann. § 501.021 (West Supp. 2008) (allowing voters to determine whether to allow sale of alcohol within political subdivision).
The statute at issue in this case does not require sexually oriented businesses to move from their current locations, imposes no direct limitation on the type of erotic expression entertainers may provide, and does not completely ban the consumption of alcohol within a sexually oriented business. Rather, the statute imposes a fee on a sexually oriented business only if it chooses to allow the consumption of alcohol on its premises. Nothing in the cases relied upon by either of the other two justices convinces me that a more exacting standard should be employed to review a statute that has a more modest impact on First Amendment expression than the regulations described above.

The Statute Survives Intermediate Scrutiny
Having determined that the statute in question in this case should be reviewed under intermediate scrutiny, I would then determine whether the statute may be upheld under that level of scrutiny. In the context at issue in this case, a regulation satisfies intermediate scrutiny if it was issued "pursuant to a legitimate governmental power"; "does not completely prohibit adult entertainment"; "is aimed not at the suppression of expression, but rather at combating negative secondary effects"; and "is designed to" further a "substantial governmental interest and the restriction on expressive conduct is no greater than is essential in furtherance of that interest." Illusions, 482 F.3d at 311.
There is no dispute that the legislature has the authority to regulate both alcohol consumption and sexually oriented businesses. Cf. Ben's Bar, 316 F.3d at 722 (explaining that regulation of alcohol consumption falls within state's police powers). In addition, as described earlier, the statute in question does not completely ban erotic entertainment. Cf. California v. LaRue, 409 U.S. 109, 118-19, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972) (upholding constitutionality of regulation that prohibited certain types of erotic expression in bars and noting that state did not ban the expression entirely, but merely prohibited it in establishments that allow for the consumption of alcohol). Consequently, the first two elements are met.
Regarding the third element, as described previously, nothing in the statute directly addresses any aspect of erotic expression; rather, the statute addresses the pairing of erotic expression with the consumption of alcohol. Moreover, rather than prohibiting any particular act of expression, the statute simply imposes a fee on establishments that desire to allow the consumption of alcohol on their premises and that provide erotic entertainment.
Furthermore, the statute attempts to address some of the potentially negative secondary effects from the pairing of alcohol *875 and erotic expression by using a portion of the total fees collected to provide revenue for the State's sexual assault program fund. Additionally, the legislative history for the statute demonstrates that the purpose of the statute was to provide funding for programs alleviating the impact of secondary effects. See Senate Research Ctr., Bill Analysis, Tex. H.B. 1751, 80th Leg., R.S. (2007) (stating that fee will be used to fund "programs that relate to sexual assault prevention, intervention, and research"); House Research Org., Bill Analysis, Tex. H.B. 1751, 80th Leg., R.S. (2007) (listing various sexual assault programs that money raised by fee could be used for). Although the effect of the fee on potential secondary effects may be more attenuated than a complete ban on alcohol consumption within businesses providing erotic entertainment would be, a state must be given a reasonable opportunity to experiment with solutions to serious problems affecting its populace. See Pap's A.M., 529 U.S. at 301, 120 S.Ct. 1382.
In light of the preceding, I would conclude that the statute is aimed at combating negative secondary effects and is not aimed at the suppression of expression. Cf. Fantasy Ranch, 459 F.3d at 557 (concluding that intermediate scrutiny was appropriate because the ordinance was "predominately targeted to the prevention of secondary effects, not to the suppression of symbolic expression"). For the reasons that follow, I would also conclude that the fourth element is satisfied.
To satisfy the "substantial interest" requirement of the final element, the State must present some evidence demonstrating a connection "between the combination of alcohol [consumption] and erotic dancing and negative secondary effects." Illusions, 482 F.3d at 312-13; see Fantasy Ranch, 459 F.3d at 561 (requiring only that regulation be supported by evidence that could reasonably be viewed as relevant to effects in question). However, the burden on the State is very light, Illusions, 482 F.3d at 312, and the State is not required to prove that its regulation is the only way to combat potential negative secondary effects, see Alameda Books, 535 U.S. at 437, 122 S.Ct. 1728.
The link between sexually oriented businesses and negative secondary effects has been discussed in various cases, Pap's A.M., 529 U.S. at 300, 120 S.Ct. 1382 (noting that crime and other safety issues are caused by "presence of nude dancing establishments"), and courts have also identified a state's interest in combating these effects as a substantial interest, see, e.g., Barnes, 501 U.S. at 583, 111 S.Ct. 2456 (Souter, J., concurring) (concluding that states have substantial interest in preventing negative secondary effects associated with sexually oriented businesses). In fact, the Supreme Court has reasoned that governments are not required to obtain new evidence regarding negative secondary effects when passing new regulations for sexually oriented businesses and may instead rely on evidence previously discovered, including evidence summarized in prior cases. Pap's A.M., 529 U.S. at 296-97, 120 S.Ct. 1382. In addition, the legislature has specifically identified a link between sexually oriented businesses and negative secondary effects. In particular, the legislature has determined that it is appropriate to impose regulations on sexually oriented businesses that are not imposed on other businesses because "sexually oriented businesses may be detrimental to the public health, safety, and welfare by contributing to ... the growth of criminal activity." Tex. Loc. Gov't Code Ann. § 243.001(a) (West 2005).
Although the link between sexually oriented businesses and negative secondary *876 effects has been previously established, evidence was also presented at trial suggesting a link between sexually oriented businesses and the types of behavior that the sexual assault fund is designed to combat. See Barnes, 501 U.S. at 582, 111 S.Ct. 2456 (Souter J., concurring) (explaining that when determining whether statute is constitutional, courts should focus on whether there is current governmental interest and not on whether interest was thoroughly articulated when regulation was issued); Fantasy Ranch, 459 F.3d at 560 (stating that governments may justify enactment of regulation with evidence presented at trial). In fact, the district court found that the State "presented persuasive trial evidence supporting a possible link between the business activity subject to the tax and the secondary effects addressed by the sexual assault program fund." Specifically, expert testimony was introduced stating that viewing erotic entertainment while consuming alcohol increases the likelihood that sexually assaultive behaviors might ensue. Moreover, various expert witnesses also stated that it was reasonable for legislators to conclude that there is a causal link between viewing erotic entertainment while consuming alcohol and sexually assaultive behavior.
For these reasons, I would conclude that the State has a substantial interest in combating negative secondary effects and that the statute at issue furthers that interest. See Illusions, 482 F.3d at 312 (explaining that courts must determine whether substantial interest exists and whether regulation facilitates that interest).
Regarding the restrictive component of the final element, as mentioned previously, the statute at issue imposes no affirmative ban on any expressive conduct. Instead, the statute imposes a fee on establishments providing erotic entertainment that also allow their patrons to consume alcohol. Nothing prohibits businesses from continuing to provide erotic entertainment and allow patrons to consume alcohol provided that the businesses pay the fee. Alternatively, businesses may continue to provide erotic entertainment without paying the fee if they stop allowing their customers to consume alcohol or if they require their performers to wear minimal clothing. See Pap's A.M., 529 U.S. at 301, 120 S.Ct. 1382 (commenting that requiring performers to wear minimal clothing has de minimus impact on erotic expression).
Given that the statute does not directly target any type of expressive conduct, that the statute provides multiple avenues in which businesses may continue providing erotic entertainment, and that courts have upheld other regulations actually limiting the type of erotic expression that may be conveyed, see id. at 284, 301, 120 S.Ct. 1382 (upholding ordinance requiring dancers to wear minimal attire while engaged in erotic entertainment); Hang On, 65 F.3d at 1256-57 (stating that ordinance prohibiting contact between customers and erotic performer did not burden protected expression more than is essential to "interest in preventing prostitution, drug dealing, and assault"), I would conclude that the statute's restriction on expressive conduct is no greater than is essential.
Having determined that all four prongs of intermediate scrutiny were satisfied, I would hold that section 47.052 of the business and commerce code does not violate the First Amendment of the federal constitution.[4]
NOTES
[1] Because the appellants' interests are aligned, we will refer to them collectively as "the Comptroller."
[2] For purposes related to TEA and Karpod's state constitutional claims, the parties dispute whether the assessment at issue in this case is properly considered a tax or a fee. We will adopt the language of the trial court's order, which refers to the assessment as a tax. However, because we need not reach the state constitutional claims in this appeal, we express no opinion on whether the assessment imposed by subchapter B is properly considered a tax or a fee.
[3] After oral argument was heard in this case, both sides requested leave to file post-submission briefs. Those motions are hereby granted.
[4] During the 2007 session, the legislature also repealed chapter 47 of the business and commerce code, effective April 1, 2009, as part of a nonsubstantive statutory revision program. See Act of May 15, 2007, 80th Leg., R.S., ch. 885, § 2.47(a)(1), 2007 Tex. Gen. Laws 1905, 2082. Subchapter B of chapter 47 was enacted without reference to this repeal.
[5] In light of its finding that the statute is unconstitutional under the First Amendment, the trial court declined to reach TEA and Karpod's state constitutional claims.
[6] While the Comptroller characterizes the SOB tax as a "modest fee" of five dollars per customer, "the level of the fee is irrelevant. A tax based on the content of speech does not become more constitutional because it is a small tax." Forsyth County v. Nationalist Movement, 505 U.S. 123, 136, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).
[7] Because Justice Kennedy concurred in the judgment of the Court on the narrowest grounds, his concurrence represents the Court's holding in Alameda Books. See Marks v. United States, 430 U.S. 188, 194, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (internal quotation marks and citation omitted).
[8] We note that the Court's holding in 44 Liquormart did not foreclose the possibility of a state using its inherent police power to place restrictions on the sale of alcohol in the presence of nude dancing. See 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 516, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). However, such use of a state's police power must satisfy First Amendment scrutiny. See Young v. American Mini Theatres, Inc., 427 U.S. 50, 80, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion) (Powell, J., concurring) (stating that "no aspect of the police power enjoys immunity from searching constitutional scrutiny").
[9] The fact that there is no constitutional right to provide alcohol in the presence of nude dancing is immaterial because "even though a person has no `right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely," including those that demand the surrender of a constitutional right. Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).
[10] TABC is authorized to "exercise all powers, duties, and functions conferred by" the alcoholic beverage code, and "shall inspect, supervise, and regulate every phase of the business of manufacturing, importing, exporting, transporting, storing, selling, advertising, labeling, and distributing alcoholic beverages, and the possession of alcoholic beverages for the purpose of sale or otherwise." Tex. Alco. Bev.Code Ann. § 5.31 (West 2007).

We note also that chapter 183 of the tax code, which imposes a tax on gross receipts derived from the sale of "mixed beverages," includes a "conflict of rules" provision to govern conflicts between regulations issued by TABC and those issued by the Comptroller in the collection of the tax. See Tex. Tax Code Ann. § 183.052 (West 2008). No similar provision appears in the SOB tax statute, suggesting that the legislature did not contemplate the exercise of TABC's regulatory authority in connection with the SOB tax.
[11] During the hearing, a representative from the Comptroller's office testified that the SOB tax would create "an additional audit burden" and stated that "these particular establishments are regulated by the TABC and they are subject to audit already by the TABC," so "[h]opefully we can join forces with the TABC." When asked, "Is the bill specifically tied to those entities that are selling liquor? If it is not, how are you going to [audit] the entities that don't sell liquor?" the Comptroller's representative answered, "Well, I believe we would be on our own on that case."
[12] Even if we were to consider the SOB tax to be content-neutral, it would fail constitutional muster under the intermediate-scrutiny standard because it is not narrowly tailored to further a substantial governmental interest. See Clark v. Community for Creative Non-Violence, 468 U.S. 288, 294, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (citing United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). In determining whether a restriction on speech is narrowly tailored, "the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct." Ward v. Rock Against Racism, 491 U.S. 781, 801, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). In the present case, the majority of the proceeds resulting from the SOB tax are allocated for a purpose that, while laudable, bears no relation to the overall problem that the State claims it is seeking to correctthe negative secondary effects of nude dancing when combined with alcohol. While the first $25 million in revenue per biennium is allocated to the sexual assault program fund, the remainderand the vast majorityof the revenue is dedicated to providing health insurance to low-income individuals. See Tex. Bus. & Com.Code Ann. §§ 47.054-.055 (West Supp.2008). The Comptroller presented no evidence at trial of a link between a lack of health insurance and nude dancing where alcohol is consumed. Because the State has imposed a tax on protected speech and allocated only a fraction of the proceeds to combat secondary effects, there is "an inadequate nexus between the regulation and the interest sought to be served." Clark, 468 U.S. at 299 n. 8, 104 S.Ct. 3065; see also Ward, 491 U.S. at 799, 109 S.Ct. 2746 ("Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.").
[13] The Comptroller argues that Caldwell contradicts the Texas Supreme Court's decision in W.D. Haden Co. v. Dodgen, 158 Tex. 74, 308 S.W.2d 838 (1958). However, in Dodgen, the court expressly distinguished between suits "to compel performance of or to enforce rights arising out of a contract with a state agency," which are considered suits against the State for purposes of sovereign immunity, and suits seeking a determination of a person's rights when state officials act outside their lawful authority, which are not considered suits against the State for sovereign-immunity purposes. 308 S.W.2d at 840. This Court's holding in Caldwell is consistent with this distinction.
[14] On appeal, the Comptroller does not contest TEA's associational standing to bring suit. See Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (requirements for associational standing).
[15] Chapter 112 also allows taxpayers to bring a refund suit, see Tex. Tax Code Ann. § 112.151 (West 2008), which is distinct from a tax-protest suit, see id. § 112.052 (West 2008). Karpod did not seek a refund under section 112.151.
[16] The trial court's judgment declaring the tax unconstitutional was issued on March 28, 2008, and the order awarding attorneys' fees was issued April 11, 2008. Karpod did not pay the tax under protest or file its written protest letter until April 21, 2008, the date that the first SOB tax payments became due.
[17] TEA, for that matter, had no access to a tax-protest suit at any time during this litigation because it is not a taxpayer for SOB tax purposes. As a result, TEA's claim under the UDJA is not a redundant remedy preventing an award of attorneys' fees.
[1] See also City of Erie v. Pap's A.M., 529 U.S. 277, 281-82, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality op.) (applying Renton's secondary-effects doctrine to justify non-zoning restrictions); Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (citing Renton for proposition that "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others" in non-zoning context). The federal courts of appeals have followed suit. See, e.g., Fantasy Ranch Inc. v. City of Arlington, 459 F.3d 546, 556 (5th Cir.2006) (holding that city ordinance requiring sexually oriented businesses to enforce proximity provisions between nude dancers and patrons was content-neutral because "the ordinance's predominate concern is for secondary effects"); Dream Palace v. County of Maricopa, 384 F.3d 990, 1013 (9th Cir.2004) (equating second question of Renton test to determination of whether statute was designed to combat secondary effects of adult entertainment industry); G.M. Enters., Inc. v. Town of St. Joseph, 350 F.3d 631, 637 (7th Cir.2003) (focusing level-of-scrutiny inquiry solely on whether ordinances targeted secondary effects of sexually oriented businesses and opting not to decide whether ordinances were content-based or content-neutral).
[2] See Fantasy Ranch, 459 F.3d at 560-61 (discussing post-enactment evidence in determining whether ordinance furthered important or substantial government interest); N.W. Enters. Inc. v. City of Houston, 352 F.3d 162, 175 (5th Cir.2003) (holding same and noting that question-two stage is not appropriate point to require legislature "to show evidence of negative secondary effects and of the new regulations' efficacy" because "[d]isputes over the effectiveness of the proposed regulations are properly reserved for the final prong of the Renton analysis").
[1] In her opinion, Justice Henson agrees that the type of expressive conduct at issue in this case only barely falls within the protections of the First Amendment. However, rather than concluding that the conduct's placement on the edge of protected speech subjects the behavior to less constitutional protection, she confusingly concludes that the type of expressive conduct at issue in this case warrants the highest judicial scrutiny, presumably higher than that afforded to behaviors more truly expressive in nature, to prevent unfair suppression.
[2] Regardless of the amount of the fee, the imposition of a fee for engaging in certain activities is less restrictive than banning the activity in its entirety because individuals have the option of engaging in the activity by paying the fee. Although businesses may challenge the amount of the fee as being excessive, those arguments are fundamentally different than challenging the State's authority to impose the fee at all.
[3] Justice Henson tries to dismiss the State's "greater power includes the lesser power" by relying on a hypothetical described in Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). In that case, the Supreme Court noted that a state could prohibit people from shouting the word "fire" in crowded theaters without violating the First Amendment because the prohibition would fall within a state's power to protect the public safety. Id. at 837, 107 S.Ct. 3141. However, the Court also theorized that a state could not adopt the ban but also allow individuals to violate the ban if they chose to contribute $100 to the state treasury. Id. The Court noted that the second situation would amount to a lesser restriction than a total ban but also concluded that the addition to the ban would be unrelated to the purpose of protecting the public safety and would, in fact, alter the purpose of the ban. Id. In effect, the Court reasoned that the imposition of the fee was improper because imposing the fee would not further the state's interest in encouraging public safety. In other words, the Court determined that "the condition substituted for the prohibition [would] utterly fail[] to further the end advanced as the justification for the prohibition." Id.

The fee at issue in this case is unlike the one described above because the fee in this case is designed to further the same interest that a total ban on erotic entertainment and alcohol consumption would accomplish: minimizing potential negative secondary effects resulting from the consumption of alcohol and the viewing of erotic entertainment. Accordingly, the fee at issue in this case is actually more similar to the other hypothetical described in Nollan, in which the Court theorized that because a state could refuse to issue a building permit in order to protect public's interest in a beach, the State could also legitimately grant the permit but impose limitations designed to protect the public's interest in that property. Id. at 836-37, 107 S.Ct. 3141.
[4] Because the district court concluded that the statute violated the First Amendment, it made no determination regarding the Association's other attacks on the statute. Having found that the statute does not violate the First Amendment, I would reverse the judgment of the district court and remand the case for consideration of the other issues raised in the case.